999 A.2d 1116

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
JOHNNIE DAVILA AKA JOHNNY CHRISTOPHER AKA
JOHNNIE CROSBY, DEFENDANT–APPELLANT.

Argued February 2, 2010—Decided July 14, 2010.

100

*Susan Brody,* Assistant Deputy Public Defender, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney).

*Steven A. Yomtov,* Deputy Attorney General, argued the cause for respondent (*Paula T. Dow,* Attorney General of New Jersey, attorney).

Justice LaVECCHIA delivered the opinion of the Court.

A warrantless search of a dwelling led to the arrest of defendant Johnnie Davila. Defendant moved to suppress the evidence obtained as a result of that search. He contested the asserted consensual nature of the entry of six officers into the apartment and, further, challenged the officers' right to search the entire apartment under the rubric of conducting a protective sweep for purposes of officer safety. The trial court's denial of defendant's motion led to his plea. Defendant appealed and the Appellate Division affirmed.

We granted certification to address two important issues arising out of *Maryland v. Buie,* 494 *U.S.* 325, 110 *S.Ct.* 1093, 108 *L.Ed.*2d 276 (1990). There, the United States Supreme Court recognized that law enforcement officers must be able to conduct, when necessary for safety's sake, a "quick and limited search" of a dwelling incident to an arrest, and authorized a "protective sweep" exception to the Fourth Amendment's warrant requirement. *Id.* at 327, 110 *S.Ct.* at 1094, 108 *L.Ed.*2d at 281. In this matter we consider for the first time *Buie* and its application in a non-arrest setting in which entry was based on consent. The issue is squarely presented. The State's argument throughout this matter has been that once the investigating officers' door knock was answered and an apartment occupant consented to speak to the officers, the officers were entitled to conduct a protective sweep of the entire apartment because the crime under investigation involved a double murder and the officers at the doorway thought that they might find perpetrators of the murders in the apartment. That assertion is in juxtaposition to the State's admission that the officers knew when they went to the apartment that they lacked both probable cause to arrest and probable cause to search the premises.

We hold that the existence of the arrest warrant in *Buie* was not essential to the Supreme Court's rationale for approving the officers' use of a protective sweep in that matter. However, to permit a warrantless protective sweep of a home *whenever* officers are lawfully within premises, without appropriate limitations, risks swallowing whole the salutary aims of requiring an advance warrant to search. Individuals are possessed of a constitutional right to be free from unreasonable searches and seizures, particularly when in the sanctity of a home. That right expressly recognizes, however, that governmental officers, tasked with the maintenance of peace within society, occasionally may infringe on the privacy of the individual, even when lacking a warrant issued by a neutral magistrate, when exigent circumstances demand immediate action.[1] It falls to the courts to evaluate those competing interests.

The ability of law enforcement officers to take reasonable steps to protect themselves from harm while performing their lawful duties has been a matter of concern to this Court that has weighed in the balancing of the reasonableness of officer behavior. In seeking proper balance in this non-arrest context, we recognize that a protective sweep—in appropriate circumstances—is a necessary and important tool for law enforcement safety. We therefore hold that officers may employ the technique of a protective sweep of a dwelling subject to the following restrictions.

A protective sweep may only occur when (1) police officers are lawfully within private premises for a legitimate purpose, which may include consent to enter; and (2) the officers on the scene have a reasonable articulable suspicion that the area to be swept harbors an individual posing a danger. Where those substantive conditions are met, as a matter of procedure, the sweep will be upheld only if (1) it is conducted quickly; and (2) it is restricted to places or areas where the person posing a danger could hide.

---

[1] "Freedom and privacy are precious rights which must be zealously guarded for the individual. But without the general security of law and order they would lose their meaning for all." *State v. Dilley,* 49 *N.J.* 460, 470, 231 *A.2d* 353 (1967).

Importantly, when an arrest is not the basis for officer entry, the legitimacy of the police presence must be carefully examined as well as the asserted reasons for the protective sweep. Enhanced precautions are necessary to stem the possibility that a protective sweep is nothing more than an unconstitutional warrantless search. The police cannot create the danger that becomes the basis for a protective sweep, but rather must be able to point to dangerous circumstances that developed once the officers were at the scene. Where police are present in a home in a non-arrest context, there is too great a potential for the pretextual use of a protective sweep to turn an important tool for officer safety into an opportunity for an impermissible law enforcement raid.

Because the standard we articulate today was not available to the trial court and because the record as developed does not address, let alone satisfy, the limitations announced, we reverse and remand for supplemental proceedings to determine whether the police entry can be shown to meet the directives contained herein.

I.

In the early afternoon hours of November 13, 2003, defendant and three acquaintances embarked on a crime spree that began with a car theft and left two homicide victims in its wake.[2] Defendant and his conspirators, disguised in ski masks and armed with guns, stole a Jeep Cherokee in the City of Newark and drove to East Orange with a plan to commit random robberies. In East Orange, they spied Shanfidine Sutton and shot him as they approached to rob him. Defendant and his conspirators left their victim to die from his wounds. A short time later, they stopped near West Side High School in Newark. Defendant saw fifteen-year-old A.B. wearing a leather jacket and targeted the high school student as the next robbery victim. When the young man

[2] For purposes of this appeal, we recite the facts as established during the suppression hearings and defendant's plea.

resisted their effort to steal his jacket, he was shot in the chest. He also died from his wounds.

Later that day, police discovered the stolen vehicle abandoned in Newark. A joint force comprised of officers from the Essex County Prosecutor's Office, the Newark Police Department, and the East Orange Police Department assembled to investigate the case. The primary lead was a cellular telephone belonging to the Jeep's owner that was missing from the stolen vehicle when recovered and was presumed to have been taken by one of the perpetrators. With the assistance of the United States Marshals Service, which obtained a communications data warrant for records of the stolen cellular telephone, the police investigators learned that the telephone had been used with some frequency in the hours after the homicides, including seven calls made to a particular apartment located in Newark (the apartment).[3] The first call to the apartment was placed on November 13, 2003, at 10:42 p.m. Three calls were made on the morning of November 14, 2003, and three calls were also made to the apartment in the early morning of November 15, 2003. A call to the apartment at 1:01 a.m. on November 15, 2003, was the last known use of the phone.

At approximately 11:30 a.m., eleven hours after the last known call from the cell phone was made, six plain-clothed members of the joint police team and two uniformed officers headed to the apartment to further the homicide investigation. The officers, admittedly aware that they lacked probable cause to search the premises, did not attempt to obtain a warrant. Nor did the officers endeavor to identify to whom the apartment belonged, or who might reside within it. Instead, they knocked on the apartment door in the hope that someone would answer and allow them inside. The two uniformed officers remained outside the apartment building to guard the perimeter.

---

[3] At the suppression hearing, the testifying officer conceded that the communications data warrant disclosed that, in addition to the apartment, the telephone had been used to call "twenty or thirty other places"; however, the police investigative team focused its attention on the apartment.

Jayaad Brown, an overnight guest at the apartment, heard the knock on the door and responded. At the suppression hearing, one officer testified that when Brown opened the apartment door, the officers identified themselves, asked "can we come in," and Brown opened the door wider to facilitate their entry. Brown's testimony at the suppression hearing differed substantially. He said that when he opened the door to the apartment in response to the knock, he was confronted by six unidentified men who had guns drawn and pointed at him. He denied inviting the officers inside, and said that the officers immediately restrained him and placed him on the ground.

Notwithstanding the divergence over whether the officers entered the apartment based on Brown's invitation and consent, the testifying officer conceded that neither Brown's demeanor nor his behavior was threatening and that officers did not perceive anything suspicious occurring in the apartment. Nevertheless, once inside the apartment, the police team immediately dispersed throughout the residence for purposes of "secur[ing] any other individuals that may have been in that apartment" because of the suspicion that the occupants might be "implicated or connected to the homicide[s]." Thus, within moments of entering the apartment, the investigative force fanned out. Two officers remained in the entry area to secure Brown, while two others went to the apartment's rear bedroom, where they found Shawn Upshaw seated on a bed with a clear plastic bag containing suspected crack cocaine on a dresser nearby. The remaining two officers went to a middle bedroom, where they discovered defendant and Asia Coleman lying together in a bunk bed.

As a result of the narcotics discovered in the rear bedroom, all individuals in the apartment were placed under arrest. In the process of taking the occupants into custody, the officers discovered the stolen cellular device sought in connection with the homicides in the middle bedroom near where defendant and Asia Coleman were found. Following his arrest, defendant, who was the only apartment occupant connected to the homicides, provided

a full statement that implicated the three co-conspirators who joined him in the crime spree. All four suspects eventually confessed to participating in the homicides.

On March 19, 2004, an Essex County grand jury returned a fourteen-count indictment against defendant and his co-conspirators, which charged two counts of first-degree murder, in violation of *N.J.S.A.* 2C:11–3(a)(1), (2); two counts of first-degree felony murder, in violation of *N.J.S.A.* 2C:11–3(a)(3); three counts of first-degree robbery, in violation of *N.J.S.A.* 2C:15–1; two counts of unlawful possession of a weapon in the third degree, in violation of *N.J.S.A.* 2C:39–5(b); two counts of second-degree possession of a weapon for an unlawful purpose, in violation of *N.J.S.A.* 2C:39–4(a); two counts of second-degree conspiracy to commit robbery, in violation of *N.J.S.A.* 2C:5–2 and 15–1; and one count of theft by unlawful taking in the third degree, in violation of *N.J.S.A.* 2C:20–3(a).

In preparation for trial, the defendants moved to suppress the evidence seized from the apartment as the product of an illegal search and seizure. The suppression hearing included the previously mentioned testimony from one of the officers who participated in the search and from Brown. The court refused to credit Brown's testimony, citing his "jovial attitude" at the hearing and his close personal connection with the occupants of the apartment. In contrast, the court found the testifying officer credible and relied on his testimony in rendering its findings. The court concluded that the investigative team had consent to enter the apartment. Because police were lawfully in the apartment, the court classified the search that followed as a lawful protective sweep, conducted "to make certain there was no one else in the apartment that could harm them." The court identified the following circumstances as constituting articulable suspicion to justify the search:

[1]   The police were investigating a ruthless double murder which occurred, in part, in Newark.

[2]   The murders were committed with a gun.

[3]   The murders occurred within the preceding 48 hours.

[4]   The murders were committed by several African–American males.

[5]   The gun used in the commission of the murders was missing.

[6]   The apartment in question was in Newark.

[7]   A cellular telephone connected to the murders was being used to call the apartment in Newark where the police were present investigating the double murder.

Because it determined that the police were lawfully in the apartment and that the search was a valid protective sweep, the court held that the evidence seized was admissible under the plain-view exception to the warrant requirement.[4]

Defendant pleaded guilty to two counts of felony murder, in violation of *N.J.S.A.* 2C:11–3(a)(3), and one count of conspiracy to commit robbery, in violation of *N.J.S.A.* 2C:5–2 and 15–1. At sentencing, the trial court determined that the No Early Release Act (NERA), *N.J.S.A.* 2C:43–7.2, and the Graves Act, *N.J.S.A.* 2C:43–6(c), applied to the felony murder convictions. The court sentenced defendant to two concurrent thirty-year terms, with a thirty-year period of parole ineligibility and a five-year period of parole supervision. NERA and the Graves Act also were applied to the conspiracy charge and, for that, the court sentenced defendant to a concurrent term of seven years with an eighty-five percent period of parole ineligibility and a three-year period of parole supervision. Remaining charges were dismissed.

Defendant appealed, contending that the trial court improperly denied the motion to suppress because the police search was unlawful. Moreover, defendant asserted that the State had failed to meet its burden of demonstrating that he had waived his right to speak to an attorney, and argued that his statement to police also should have been suppressed. In an unpublished opinion, the Appellate Division rejected both arguments. As to the police search of the apartment, the Appellate Division referred favorably

4 Following the denial of his motion to suppress the physical evidence seized from the apartment, defendant moved to suppress his post-arrest statement to police. That motion also was denied; it is not under review in our grant of certification. *See State v. Davila,* 200 *N.J.* 368, 982 *A.*2d 456 (2009) (granting certification limited to review of warrantless search of apartment).

to the trial court's ruling, and added that a subsequent Appellate Division decision in *State v. Lane,* 393 *N.J.Super.* 132, 922 *A.*2d 828 (App.Div.), *certif. denied,* 192 *N.J.* 600, 934 *A.*2d 641 (2007), underscored the validity of the search of the apartment as a protective sweep. Applying the factors enunciated in *Lane,* the Appellate Division was satisfied that the police entry into the apartment was legal and reasonable, and that the trial court's decision was founded on the substantial evidence presented. The panel also was satisfied as to the adequacy of defendant's waiver of his rights pursuant to *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

Defendant petitioned for certification, reasserting both arguments raised before the Appellate Division. We granted his petition, limited to the question whether the search of the apartment constituted a valid protective sweep, exempt from the Fourth Amendment's warrant requirement. 200 *N.J.* 368, 982 *A.*2d 456 (2009).

## II.

Before this Court, defendant's argument proceeds in two parts. He first contends that the police were not legally present in the apartment, and that the trial court erred in finding that Brown gave his consent for them to enter. He disputes the trial court's findings of fact, and points to discrepancies in the testimony presented at the motion to suppress in support of that argument. Second, and independent of whether the police were legally within the apartment, defendant argues that the police lacked the reasonable articulable suspicion of danger that is required before a protective sweep is lawful. He suggests that the police created what little danger existed by approaching the apartment without first investigating its occupants. Categorizing the search of the apartment as a raid rather than a protective sweep, defendant argues that police were acting on a mere hunch when they conducted their unlawful search and seizure. Therefore, he con-

cludes that the evidence obtained through that unconstitutional activity must be suppressed.

The State responds that the trial court's determination that the police entered the apartment based on consent was proper in that it was based on credibility determinations supported by the record. As to the search of the apartment, the State's argument throughout this matter has been that once the officers' knock was answered and a person present in the apartment consented to speak to the officers, the officers were entitled to conduct a protective sweep of the entire apartment. According to the State, because the crimes under investigation involved a heinous double murder and the officers at the doorway thought that they might find perpetrators of the murders in the apartment, they were entitled to perform a protective sweep for the officers' safety. Thus, the State contends that because it was a valid protective sweep, the trial court properly denied the motion to suppress the evidence seized.

## III.

The threshold issue raised by defendant is whether the police were lawfully within the premises based on Brown's consent. As the facts of this case demonstrate, the trial court's conclusion that Jayaad Brown consented to police entry into the apartment rested on a credibility determination. The court found the testimony of the officer to be credible, and discounted the testimony from Jayaad Brown due to his attitude toward the proceeding and his close personal relationship with the other individuals who had been arrested in the apartment.

We generally defer to the factual findings of the trial court, provided those findings are supported by substantial and credible evidence in the record. *See State v. Elders*, 192 *N.J.* 224, 243, 927 *A.*2d 1250 (2007). While an appellate court "should give deference to those findings of the trial judge which are substantially influenced by his opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot

enjoy," it may re-appraise the record and make its own alternative finding if it "is thoroughly satisfied that the finding is clearly a mistaken one and so plainly unwarranted that the interests of justice demand intervention and correction." *State v. Johnson*, 42 *N.J.* 146, 161–62, 199 *A.*2d 809 (1964) (citations omitted). More than a mere "disagreement with how the motion judge weighed the evidence in a close case," though, is required if a substituted finding is to be made by an appellate court. *Elders, supra*, 192 *N.J.* at 245, 927 *A.*2d 1250 (criticizing Appellate Division's lack of deference to trial court).

In the context of the present case, defendant's arguments fail to demonstrate the clear error necessary for a rejection of the motion court's findings. The record demonstrates an adequate basis for the trial court's determination that Brown's testimony was not credible. Certainly in respect of Brown's testimony, the court was in the better position to assess whether his body language, attitude, and general demeanor conveyed a lack of reliability in his testimony. The court's stated reasons for finding that Brown's courtroom behavior sabotaged his credibility have not been seriously undermined by defendant and that, coupled with the court's reasons for finding Brown a biased witness, render the court's credibility determination as to Brown unassailable.

We also conclude that there was adequate, substantial and credible support in the record for the court's determination to credit the testifying officer's evidence. That said, we would be remiss if we did not note that the record is unclear whether the officers had their guns drawn when Brown opened the door to their knock. Even discounting Brown's testimony, which asserted that the plain-clothed officers had their guns out, the most that the testifying officer brought by way of clarification on this factual aspect to the "consensual" nature of the entry was that he did not have his gun drawn, and he did not know for certain whether the others, standing behind him, did. The motion court would have been better served by greater factual precision in the State's

presentation and should insist on same. That said, in light of the standard of review, we defer to the trial court's finding that Brown consented to the police officers' entry into the front room, or foyer, of the apartment. *See Elders, supra,* 192 *N.J.* at 243–45, 927 *A.*2d 1250.

Thus, having established that the police entry into the home was lawful, we must consider whether the search that followed was constitutional.

## IV.

## A.

The Fourth Amendment directs that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *U.S. Const.* amend. IV; *see also N.J. Const.* art. I, ¶ 7 ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue except upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the papers and things to be seized."). While "[a]ny warrantless search is *prima facie* invalid," *State v. Hill,* 115 *N.J.* 169, 173, 557 *A.*2d 322 (1989), the United States Supreme Court has directed that

[t]he touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes on an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.

[*United States v. Knights,* 534 *U.S.* 112, 118–19, 122 *S.Ct.* 587, 591, 151 *L.Ed.*2d 497, 505 (2001) (internal quotation marks and citation omitted).]

The presumption of invalidity that exists, then, may be overcome by a showing that a warrantless search was yet reasonable because it "falls within one of the specific exceptions created by

the United States Supreme Court." *Hill, supra,* 115 *N.J.* at 173, 557 *A.*2d 322 (citation omitted). The State bears the burden of demonstrating that a particular search fits within one of those recognized exceptions. *Id.* at 174, 557 *A.*2d 322 (citation omitted).

The home is entitled to particular protection from unwarranted intrusion because "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *See, e.g., United States v. U.S. Dist. Court,* 407 *U.S.* 297, 313, 92 *S.Ct.* 2125, 2134, 32 *L.Ed.*2d 752, 764 (1972); *accord State v. Bogan,* 200 *N.J.* 61, 72, 975 *A.*2d 377 (2009); *State v. Hutchins,* 116 *N.J.* 457, 462–63, 561 *A.*2d 1142 (1989). A bedrock legal principle thus renders warrantless searches and seizures inside a home "presumptively unreasonable." *Payton v. New York,* 445 *U.S.* 573, 586, 100 *S.Ct.* 1371, 1380, 63 *L.Ed.*2d 639, 651 (1980) (citing *Coolidge v. New Hampshire,* 403 *U.S.* 443, 91 *S.Ct.* 2022, 29 *L.Ed.*2d 564 (1971)); *see also Kyllo v. United States,* 533 *U.S.* 27, 31, 121 *S.Ct.* 2038, 2042, 150 *L.Ed.*2d 94, 100 (2001) (stating that "[w]ith few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no" (citations omitted)).

The search and seizure at issue in the instant case plainly was not conducted pursuant to a warrant; accordingly, the question is whether the law enforcement activity which occurred inside the apartment was otherwise reasonable to survive scrutiny in reliance on the Fourth Amendment. Because the safeguard of a warrant is absent, the government must establish the reasonableness of the search. *Hill, supra,* 115 *N.J.* at 174, 557 *A.*2d 322. With those familiar tenets of Fourth Amendment jurisprudence well in mind, we turn to the protective sweep exception to the warrant requirement upon which the search challenged in this case depends. As this Court has yet to consider or apply this exception, the issue is one of first impression.

### B.

In *Maryland v. Buie, supra,* the United States Supreme Court contemplated the circumstances in which law enforcement agents,

"while effecting the arrest of a suspect in his home pursuant to an arrest warrant, may conduct a warrantless protective sweep of all or part of the premises." 494 *U.S.* at 327, 110 *S.Ct.* at 1094, 108 *L.Ed.*2d at 281. As the Supreme Court has not revisited the protective sweep exception to the Fourth Amendment's warrant requirement since, the facts presented in *Buie* require attention.

In the course of an investigation into an armed robbery perpetrated by two men, police investigators had obtained a warrant to arrest Buie and an accomplice. *Id.* at 328, 110 *S.Ct.* at 1095, 108 *L.Ed.*2d at 282. Officers entered Buie's home to execute the warrant, and fanned throughout the property in an effort to find the defendant. *Ibid.* Buie, of his own volition, emerged from the basement with his hands in the air, only to be arrested, searched, and handcuffed. *Ibid.* Notwithstanding Buie's surrender, an officer went down into the basement to ensure that no one else was present, and discovered and seized evidence of the crime in plain view. *Ibid.* Buie's motion to suppress, initially denied by the Maryland trial court, was granted by Maryland's highest court, which found that the state failed to demonstrate the probable cause needed to justify an intrusion on the "sanctity" of the home. *Id.* at 328–29, 110 *S.Ct.* at 1095, 108 *L.Ed.*2d at 282–83.

The United States Supreme Court's opinion opened with its seminal definition that "[a] 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id.* at 327, 110 *S.Ct.* at 1094, 108 *L.Ed.*2d at 281. Notwithstanding the succinctness of its definition, the *Buie* opinion dwelled on the "level of justification [that] is required by the Fourth and Fourteenth Amendments before police officers, while effecting the arrest of a suspect in his home pursuant to an arrest warrant, may conduct a warrantless protective sweep of all or part of the premises." *Ibid.* The Court recognized Buie's significant expectation of privacy in his home, but found that there was a strong abutting interest in enabling

officers to protect themselves. *Id.* at 333, 110 *S.Ct.* at 1097–98, 108 *L.Ed.*2d at 285 (stating that "[t]he risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter" particularly because arresting officer is on criminal's "turf"). Faced with those conflicting interests, the Court turned for guidance to the reasonableness and balancing principles applied in *Terry v. Ohio* [5] and *Michigan v. Long,* [6] and concluded that "incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 333–34, 110 *S.Ct.* at 1097–98, 108 *L.Ed.*2d at 285–86. However, to justify a search beyond that scope, "there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 334, 110 *S.Ct.* at 1098, 108 *L.Ed.*2d at 286. As additional limitations, the Court emphasized that a valid sweep is

> not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found. The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises.
>
> [*Id.* at 335–36, 110 *S.Ct.* at 1099, 108 *L.Ed.*2d at 287 (footnote omitted).]

Examining the search presented in *Buie,* the Supreme Court held that because the defendant voluntarily exited the basement before arrest, the police could not sweep that area absent some showing of articulable suspicion of potential harm, and it remanded to permit such a demonstration. *Id.* at 327–28, 110 *S.Ct.* at 1095, 108 *L.Ed.*2d at 282.

---

[5] 392 *U.S.* 1, 88 *S.Ct.* 1868, 20 *L.Ed.*2d 889 (1968).

[6] 463 *U.S.* 1032, 103 *S.Ct.* 3469, 77 *L.Ed.*2d 1201 (1983).

*Buie* clearly directs courts contemplating the validity of a protective sweep to engage in a three-pronged inquiry. The first prong addresses the circumstances in which a protective sweep may take place: it is valid if, incident to an arrest, police restrict their search to the immediate vicinity of the arrest from which an attack might be launched. *Id.* at 334, 110 *S.Ct.* at 1098, 108 *L.Ed.*2d at 286. A sweep of the immediate area of the arrest may be conducted in the absence of probable cause or reasonable suspicion. *Ibid.* However, police seeking to expand their search beyond the immediate area of arrest may do so only if there are specific facts that would cause a reasonable officer to believe there is an individual within the premises who poses a danger to those present. *Ibid.* The second prong mandates that the search be "quick." *Id.* at 327, 110 *S.Ct.* at 1094, 108 *L.Ed.*2d at 281. A valid "sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335–36, 110 *S.Ct.* at 1099, 108 *L.Ed.*2d at 287. The third prong to the *Buie* test is that the officers may only engage in a "limited search of premises." *Id.* at 327, 110 *S.Ct.* at 1094, 108 *L.Ed.*2d at 281. The protective sweep must be "narrowly confined to a cursory visual inspection of those places in which a person might be hiding," *id.* at 327, 110 *S.Ct.* at 1094, 108 *L.Ed.*2d at 281, and thus is not a search for weapons or contraband, although such items in plain view may be seized during the course of the search. *See id.* at 330, 110 *S.Ct.* at 1096, 108 *L.Ed.*2d at 283 (citing *Arizona v. Hicks*, 480 *U.S.* 321, 326, 107 *S.Ct.* 1149, 1153, 94 *L.Ed.*2d 347, 354 (1987)).

Though we have not previously had the occasion to consider the applicability of the *Buie* doctrine within New Jersey, we have long shared the dual concerns for individual rights and officer safety that underpin *Terry* and *Long,* and our commitment to balancing those principles is well documented. *See, e.g., Dilley, supra,* 49 *N.J.* 460, 231 *A.*2d 353 (upholding on-street stop and frisk as reasonable based on totality of circumstances nearly one year prior to United States Supreme Court ruling in *Terry v.*

*Ohio* ).   We regard the protective sweep authorized in *Buie* as aligned with an evolution of familiar principles adhered to in this State, which provide law enforcement officers with critical safety tools to perform their oft-dangerous tasks.   The protective sweep incident to arrest, if wielded in accordance with the *Buie* limitations, will remain respectful of precious individual Fourth Amendment rights.   We therefore hold that *Buie* established a valuable and workable standard for law enforcement officers and courts to employ in evaluating protective sweeps incident to an in-home arrest, and we turn our focus to the pressing question squarely posed by this case:  whether the protective sweep exception to the warrant requirement should be more broadly available to officers who are lawfully present in private premises for some purpose other than to effect an arrest, and, if so, under what circumstances.

## V.

### A.

The Supreme Court has characterized as "dubious logic ... [the idea] that an opinion upholding the constitutionality of a particular search implicitly holds unconstitutional any search that is not like it."  *Knights, supra,* 534 *U.S.* at 117, 122 *S.Ct.* at 590, 151 *L.Ed.*2d at 504.   With that invitation to examine the constitutionality of protective sweeps beyond the factual contours of *Buie,* we begin with the observation that one is hard-pressed to find convincing evidence that the result reached in *Buie* hinged on the presence of the arrest warrant or even the fact that an arrest was taking place.   Rather, the *Buie* Court relied on the existence of probable cause to arrest Buie as justification for the police presence within the home;  the ability to perform the protective sweep derived from that valid presence.  *See Buie, supra,* 494 *U.S.* at 334 n. 1, 110 *S.Ct.* at 1098, 108 *L.Ed.*2d at 286 ("[T]he arrest warrant gave the police every right to enter the home to search for Buie. Once inside, the potential for danger justified a standard of less than probable cause for conducting a limited protective sweep.").

In addition, the Supreme Court expressed serious concern for officer safety when articulable facts are present that justify taking the precaution of a limited protective sweep. In so doing, the Court relied on established principles enunciated in *Terry* and *Long*, which authorized police to engage in limited protective searches for weapons based on suspicion that did not rise to the level of probable cause to arrest. *See Terry v. Ohio*, 392 *U.S.* 1, 88 *S.Ct.* 1868, 20 *L.Ed.*2d 889 (1968) (upholding officer's pat-down search for weapons following observations of suspicious behavior); *Michigan v. Long*, 463 *U.S.* 1032, 103 *S.Ct.* 3469, 77 *L.Ed.*2d 1201 (1983) (upholding officer's search of vehicle interior for weapons following observation of suspicious one-car accident and knife on floorboard of vehicle). In both of those cases, the limited intrusion visited on the individual as a result of the search was justified by the ability of the officer to point to "specific and articulable facts, which taken together with rational inferences from those facts," indicated that the officer's safety or the safety of the public was in danger. *Terry, supra,* 392 *U.S.* at 21, 88 *S.Ct.* at 1880, 20 *L.Ed.*2d at 906; *Long, supra,* 463 *U.S.* at 1049–50, 103 *S.Ct.* at 3481, 77 *L.Ed.*2d at 1220. Applying the same logic, *Buie* extended the standard for a protective search into a home; that the Supreme Court did so incident to an arrest does not appear significant to its reasoning, except, of course, that the arrest demonstrated lawful police presence in the home and enhanced the perceptible danger to the officers on the scene.

In sum, we discern no basis from *Buie* itself to justify restricting its authorization of protective sweeps to the arrest context. Our conclusion is bolstered by the many jurisdictions already to have considered the applicability of the *Buie* standard to searches that do not fit neatly within the in-home-arrest paradigm.

Notably, among the circuit courts of appeal to have considered the question, most have looked to the broader principles for which *Buie* stands and have relied on those principles to extend the use of protective sweeps to searches conducted in the absence of probable cause to arrest. Those circuit courts extend the excep-

tion to varying degrees, to include sweeps conducted where police are otherwise lawfully within a private property. *See United States v. Caraballo,* 595 *F.*3d 1214, 1224–25 (11th Cir.2010) (upholding marine patrol officer's protective sweep of boat following observations of suspicious fishing activity and incident to "fisheries check" authorized by Florida statute, because "the conduct [of the defendant] gave [the officer] reason to believe there may have been another person on board"); *United States v. Miller,* 430 *F.*3d 93, 98 (2d Cir.2005) ("We now hold that a law enforcement officer present in a home under lawful process, such as an order permitting or directing the officer to enter for the purpose of protecting a third party, may conduct a protective sweep . . . ."), *cert. denied,* 547 *U.S.* 1206, 126 *S.Ct.* 2888, 165 *L.Ed.*2d 916 (2006); *United States v. Martins,* 413 *F.*3d 139, 150 (1st Cir.) ("We hold, therefore, that police who have lawfully entered a residence possess the same right to conduct a protective sweep whether an arrest warrant, a search warrant, or the existence of exigent circumstances prompts their entry." (citations omitted)), *cert. denied,* 546 *U.S.* 1011, 126 *S.Ct.* 644, 163 *L.Ed.*2d 520 (2005); *United States v. Gould,* 364 *F.*3d 578, 584 (5th Cir.) (en banc) ("[W]e hold that arrest is not always, or *per se,* an indispensable element of an in-home protective sweep, and that although arrest may be highly relevant, particularly as tending to show the requisite potential of danger to the officers, that danger may also be established by other circumstances."), *cert. denied,* 543 *U.S.* 955, 125 *S.Ct.* 437, 160 *L.Ed.*2d 317 (2004); *United States v. Taylor,* 248 *F.*3d 506, 513 (6th Cir.) ("[I]t follows logically that the principle enunciated in *Buie* with regard to officers making an arrest—that the police may conduct a limited protective sweep to ensure the safety of those officers—applies with equal force to an officer left behind to secure the premises while a warrant to search those premises is obtained."), *cert. denied,* 534 *U.S.* 981, 122 *S.Ct.* 414, 151 *L.Ed.*2d 315 (2001); *United States v. Patrick,* 959 *F.*2d 991, 996 (D.C.Cir. 1992) (upholding protective sweep where police obtained apartment lessee's permission to search, because "[o]nce the police were lawfully on the premises, they were authorized to conduct a

protective sweep"); *United States v. Daoust,* 916 *F.*2d 757 (1st Cir.1990) (upholding protective sweep incident to execution of search warrant); *see also United States v. Pruneda,* 518 *F.*3d 597, 603 (8th Cir.2008) (upholding protective sweep incident to execution of arrest warrant while commenting that "[u]pon legally entering a residence, officers have the authority to conduct a protective sweep of the residence if the officers reasonably believe, based on specific and articulable facts, that the residence harbors an individual who could be dangerous" (citations omitted)).[7]

In contrast, only one circuit has declined to extend *Buie* into the non-arrest context. *See United States v. Davis,* 290 *F.*3d 1239, 1242–43 n. 4 (10th Cir.2002) (rejecting protective sweep argument because no one in residence was under arrest at time of search); *but see United States v. Torres–Castro,* 470 *F.*3d 992, 997 (10th Cir.2006) ("[W]e must conclude that a protective sweep is only valid when performed incident to an arrest—at least until an en banc panel of this court determines otherwise."), *cert. denied,* 550 *U.S.* 949, 127 *S.Ct.* 2285, 167 *L.Ed.*2d 1116 (2007).

More locally, we cannot overlook our Appellate Division's recent ruling in *State v. Lane,* 393 *N.J.Super.* 132, 922 *A.*2d 828 (App. Div.), *certif. denied,* 192 *N.J.* 600, 934 *A.*2d 641 (2007), in which the

---

7 Our review indicates that only two circuits—the Third and the Fourth—have yet to weigh in on the permissibility of protective sweeps in the non-arrest context. *But see Sharrar v. Felsing,* 128 *F.*3d 810, 823–24 (3d Cir.1997) (giving limited extension to *Buie* in civil rights action to justify search conducted incident to arrest occurring immediately outside of home).

Two other circuits have less clearly enunciated the availability of protective sweeps outside of the in-home arrest context. *Compare United States v. Reid,* 226 *F.*3d 1020, 1027 (9th Cir.2000) (rejecting search conducted in absence of arrest as not permitted under *Buie* ), *with United States v. Garcia,* 997 *F.*2d 1273, 1282 (9th Cir.1993) (citing *Buie* for proposition that "no probable cause [is] required to sweep home to secure officers' safety" even in absence of probable cause to arrest); *compare Leaf v. Shelnutt,* 400 *F.*3d 1070, 1087–88 (7th Cir. 2005) (concluding that police in residence investigating suspected burglary may conduct protective sweep), *with United States v. Johnson,* 170 *F.*3d 708, 716 (7th Cir.1999) (noting that absence of warrant was critical flaw in government's case).

panel acknowledged that the protective sweep doctrine could extend to a search of the curtilage of a home even where the search was not conducted in conjunction with an arrest. In so applying *Buie,* the *Lane* panel engaged in a thoughtful discussion tracing the protective sweep doctrine, and concluded "that an arrest should not be the sine qua non of a legitimate protective sweep and that to hold otherwise would place undue importance on the particular facts in [*Buie* ] and show too little regard for the important public policy of insuring police safety." *Lane, supra,* 393 *N.J.Super.* at 153, 922 *A.*2d 828. As with many protective sweep cases, *Lane* addressed the use of the exception in a unique factual situation, restrictive of the wholesale adoption of its holding to broader contexts.

The undeniable national trend toward greater availability of protective searches is marked by the same officer-safety concerns that animated *Buie's* balancing test, and demonstrates a general agreement among reviewing courts that those concerns are not exclusive to the context of an in-home arrest. *See, e.g., United States v. Gandia,* 424 *F.*3d 255, 262 (2d Cir.2005) (acknowledging that because *Buie's* "underlying rationale for the protective sweep doctrine is the principle that police officers should be able to ensure their safety when they lawfully enter a private dwelling, there is no reason to distinguish between situations in which police enter pursuant to a warrant and those in which police are present through other lawful means" (quotation marks and citation omitted)). While we are not bound to join in this trend, we are persuaded, and we hold that a protective sweep conducted on private property is not per se invalid merely because it does not occur incident to an arrest.[8]

---

[8] Thus an arrest is not the sine qua non of a protective sweep, *see Lane, supra,* 393 *N.J.Super.* at 153, 922 *A.*2d 828; however, it remains a highly relevant factor to be considered in evaluating the validity of a search. *See Gould, supra,* 364 *F.*3d at 584. Although we find no basis on the facts in this case to compel divergence from the *Buie* test where police conduct a protective search incident to an in-home arrest, we decline to contemplate any such limitations in the

At the same time, although we hold that the absence of probable cause to arrest does not render a protective sweep per se illegal, we acknowledge that it would be too facile to permit a protective sweep *whenever* officers are lawfully within a premises. There is simply too great a potential for the pretextual use of otherwise lawful police presence as an opportunity to conduct a warrantless raid of a home cloaked as a protective sweep; so broad an exception would swallow whole the protections of the warrant requirement. Those concerns are particularly relevant where, as in this case, the lawfulness of the police entry is based on the consent of an occupant.

## B.

Application of *Buie's* balancing test has required even the most generous circuit panels to stop short of affirming protective sweeps in every circumstance. This hesitancy has been particularly conspicuous in recent circuit cases in which the government argued that a protective sweep was justified based on an occupant's invitation or consent for police to enter a home. *See United States v. Gandia,* 424 *F.*3d 255, 262 (2d Cir.2005); *United States v. Gould,* 364 *F.*3d 578 (5th Cir.) (en banc) *cert. denied,* 543 *U.S.* 955, 125 *S.Ct.* 437, 160 *L.Ed.*2d 317 (2004). Courts have taken particular care in formulating the test to be applied in such non-arrest consent-based settings. For example, in 2004, the Fifth Circuit took the occasion in *United States v. Gould* to reform the *Buie* test into a four-part inquiry when it opened the door to protective sweeps in the non-arrest context. In that matter, two deputy sheriffs were dispatched to talk to the defendant, a convicted felon with violent propensities, after receiving a tip that he planned to murder two judges. *Gould, supra,* 364 *F.*3d at 580. The officers were admitted into Gould's bedroom by his housemate, and were

---

abstract. That said, at a minimum, the presence of probable cause to arrest is a weighty factor in the calculation of whether officers are in danger when effecting an arrest in the home. *See Buie, supra,* 494 *U.S.* at 333–34, 110 *S.Ct.* at 1098, 108 *L.Ed.*2d at 286.

surprised when they found Gould's bed unoccupied after being assured he was asleep in the room. *Ibid.* The officers conducted a brief protective sweep to determine if Gould was hiding; although they did not find him, they did discover three firearms in the bedroom closet. *Ibid.* Following his arrest, Gould moved to suppress the rifles, arguing that the protective sweep was not justified because it was not conducted pursuant to an arrest. *Ibid.*

The Fifth Circuit, sitting en banc, rejected its former bright-line rule that protective sweeps only could occur incident to arrest, *id.* at 586 (disapproving *United States v. Wilson*, 36 *F*.3d 1298 (5th Cir.1994)), and concluded that *Buie* emphasized the arrest because it was the arrest that subjected law enforcement to danger in that case, *id.* at 581. The court could detect nothing in *Buie* that indicated that the Supreme Court would have reached a different conclusion if the police officers were lawfully in the home for some other reason when they conducted an otherwise reasonable protective sweep. *Ibid.* Having reversed its prior precedent, the *Gould* Court reformulated the *Buie* test into a four-part inquiry examining whether (1) the police were lawfully on the premises for a legitimate purpose and did not enter or remain illegally; (2) the officers had "a reasonable articulable suspicion that the area to be swept harbor[ed] an individual posing a danger"; (3) the sweep was a cursory search limited to the places in which a person could hide; and (4) the sweep took place within the narrow time constraints imposed by *Buie. See id.* at 587.

Even with that expanded formulation of the protective sweep doctrine, the panel expressed concern about the use of protective sweeps where police presence was based on consent to enter a home.

We recognize that protective sweeps following a consent entry may in certain circumstances pose Fourth Amendment concerns not present in cases where the initial entry is pursuant to a warrant. *For example, concerns might arise respecting a consent to entry requested for a stated common purpose but actually intended not for that purpose but rather for the purpose of gaining access in order to then make a protective sweep of the entire home for unrelated reasons and thus circumvent the warrant requirement. Concerns of a similar character might also arguably arise where the consent to entry is given expressly or implicitly only as*

> *to a limited area but the protective sweep extends clearly beyond that area without anything having developed since entry suggestive of greater or more imminent danger than that initially apparent just prior to entry.* We do not purport to now ultimately resolve hypothetical cases of those varieties, for the mentioned kinds of concerns are not meaningfully implicated here.
>
> [*Id.* at 589 (emphasis added).]

Setting aside its hesitation toward consent-based protective sweeps in general, the panel was satisfied that the challenged search was nevertheless reasonable as a protective sweep because the officers had valid consent to enter Gould's home and clearly did so for a legitimate investigative purpose. The panel noted that there was no evidence that the officers "deliberately created the exigent circumstances with the bad faith intent to avoid the warrant requirement," and assumed that "[h]ad the officers acted with such improper motive or intent, . . . such would have invalidated the sweep." *Id.* at 590 & n. 12. Moreover, the Fifth Circuit found that the officers possessed reasonable articulable suspicion that Gould was hiding from them based on their knowledge of Gould's troubled and violent criminal history, the threat he was accused of making against two judges, and the officers' genuine surprise when Gould was not present as expected. *Id.* at 591–92. Also satisfied that the scope and duration requirements were met, the court en banc affirmed the search as a valid protective sweep. *Id.* at 593.

One year after *Gould,* in *United States v. Gandia, supra,* the Second Circuit added another voice to the concern over consent-based protective sweeps. 424 *F.*3d 255 (2005). In that case, officers responded to a dispute between two tenants in which the defendant allegedly had brandished a weapon and threatened to kill his neighbor. *Id.* at 258. The police attempted to distance the neighbors, and three officers asked Gandia to take them into his apartment so they could speak with him in private. *Ibid.* Once inside, Gandia began telling his version of events to two of the officers while, undetected, the third began roaming about the apartment and ultimately discovered a bullet; Gandia was placed under arrest. *Id.* at 259–60.

Reversing the trial court's refusal to suppress the seized evidence, the Second Circuit echoed the *Gould* panel's concerns about protective sweeps founded on consent entry, and added its own comment

> that when police have gained access to a suspect's home through his or her consent, there is a concern that generously construing *Buie* will enable and encourage officers to obtain that consent as a pretext for conducting a warrantless search of the home.... This sort of pretext may be less likely when police enter a home with a search warrant, upon probable cause combined with exigent circumstances, or pursuant to the "danger exception" to the normal requirement that officers knock and announce themselves.
>
> [*Id.* at 262–63 (citations omitted).]

The court recognized that the police had no need to enter the apartment in the first place, that "[t]he officers could have avoided 'the disadvantage of being on [their] adversary's turf' by simply interviewing Gandia elsewhere." *Id.* at 263 (quoting *Buie, supra,* 494 *U.S.* at 333, 110 *S.Ct.* at 1098, 108 *L.Ed.*2d at 285) (internal quotation marks omitted). Alternatively, the officers could have discussed their concern over the possible presence of others with Gandia, and gained permission to conduct the sweep. *Gandia, supra,* 424 *F.*3d at 263. Most tellingly, the Second Circuit rejected the argument that police possessed "articulable facts" to suggest that Gandia had a gun, because the purpose of a protective sweep is not to uncover contraband, but rather to discover individuals who could use a weapon against police. *Id.* at 264. Thus, the reasonable articulable suspicion had to be that a person, rather than a weapon, was present, and "[l]ack of information cannot provide an articulable basis upon which to justify a protective sweep." *Ibid.* (internal quotation marks and citation omitted). Fully satisfied that the search could not be maintained as a protective sweep, the court rejected the government's argument to the contrary. *Id.* at 263–64.[9]

---

[9] The Second Circuit panel also noted that "the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Gandia, supra,* 424 *F.*3d at 265 (quoting *Florida v. Jimeno,* 500 *U.S.* 248, 251, 111 *S.Ct.* 1801, 1803–04, 114 *L.Ed.*2d 297, 302

## VI.

### A.

As the *Gould* and *Gandia* cases highlight, protective sweeps based on lawful police presence due to consent are particularly problematic in that such sweeps are vulnerable to abuse by zealous law enforcement officers investigating crimes. However, the alternative to allowing a protective sweep *whenever* law enforcement officers are in a home based on an asserted consent entry cannot reasonably be the prohibition of all protective sweeps in the non-arrest consent-entry context. We are unwilling to create such a bright-line rule that will unduly hamper and, indeed, could endanger law enforcement officers who may find themselves in dangerous circumstances while in the execution of their day-to-day functions. Therefore, a standard must guide law enforcement officers and reviewing courts. The appropriate test in the non-arrest context must involve an analysis that derives from *Buie* but also is flexible enough to take into account the special considerations required when a consensual search is involved. To achieve those purposes, we adopt the following test.

We hold that a protective sweep of a home may only occur when (1) law enforcement officers are lawfully within the private premises for a legitimate purpose, which may include consent to enter; and (2) the officers on the scene have a reasonable articulable suspicion that the area to be swept harbors an individual posing a danger. Where those substantive conditions are met, as a matter of procedure, the sweep will be upheld only if (1) it is cursory, and (2) it is limited in scope to locations in which an individual could be concealed. As additional guidance we add the following. The search should be strictly limited in duration to the time frame during which police are lawfully within the

---

(1991)). Ultimately, *Gandia* was remanded for further factual development focused on whether Gandia's failure to object to the officer moving around his apartment constituted implied consent for the search. *Ibid.*

premises. Moreover, when a protective sweep is performed in a non-arrest setting, as when police presence in the home is not due to the execution of an arrest warrant, the legitimacy of the police presence must be probed. And, a careful examination must be undertaken of the basis for the asserted reasonable articulable suspicion of dangerous persons on the premises. The law enforcement officers cannot have created the danger to which they became exposed by entering the premises, and thereby bootstrap into an entitlement to perform a protective sweep. Thus the inquiry should examine whether the request for entry was legitimate or a ruse and whether the officers can identify articulable reasons for suspecting potential harm from a dangerous person that arose once the officers arrived at the scene.

Those necessary and limiting inquiries point up the difficulty that presents in the instant matter and makes it appear, from the record developed below, that the police officers arrived with the intent to obtain consent to enter and talk to whomever answered the door as the excuse to perform a raid-like search of the premises under the cover of a protective sweep. There was no apparent showing of any on-the-scene perception that developed once the officers arrived and began to engage Brown that created a reasonable suspicion of a dangerous person within the premises who might harm the officers. The possibility that persons involved in the homicides might be in the apartment was mere speculation, as the officers admitted that they lacked probable cause to arrest or to search for evidence and cited to no unfolding development, spontaneous and unforeseen, that created a perception of danger requiring the reaction of a protective sweep. Rather, the record suggests that the officers arrived with the intent to perform a "protective sweep." If that assessment from this record turns out to be accurate, then the search was unconstitutional, and its fruits must be suppressed.

Because the trial court and the parties did not have the benefit of the standard announced today, and, indeed, did not even have the benefit of the Appellate Division's decision in *Lane, supra,*

when conducting the suppression hearing, we reverse and remand so that the relevant and searching inquiry required herein can occur.

### B.

In summary, the review of a protective sweep search and seizure shall require the State to bear the burden of proving, in these warrantless search contexts, the reasonableness of the protective sweep. That requires a demonstration that the police presence at the property that was swept was both lawful and legitimate.

As we noted earlier, the circumstances that justify a warrantless police entry into an individual's home are few and narrowly circumscribed. *See, e.g., Hill, supra,* 115 *N.J.* at 173–74, 557 *A.*2d 322 (enumerating several warrant exceptions). Thus, the State must demonstrate first that the police presence occurred pursuant to one of the recognized exceptions to the warrant requirement. *See id.* at 174, 557 *A.*2d 322. An affirmative conclusion in that regard should not terminate the inquiry. The court also must contemplate the validity of the basis asserted to justify the police presence, to determine "whether the officer had embarked on a mission untethered to constitutional principles or whether he was pursuing a legitimate purpose." *Lane, supra,* 393 *N.J.Super.* at 157, 922 *A.*2d 828. The examination is not unlike the test for determining exigency, a term for circumstances that are "by design, inexact." *State v. Cooke,* 163 *N.J.* 657, 676, 751 *A.*2d 92 (2000). Exigency takes form and shape depending on the context and the facts of the given case. *Ibid.* In a non-arrest protective sweep context, we mean to refer to circumstances that generate an articulable need to perform a sweep due to a perception of danger truly unforeseen and spontaneous, when assessed based on a totality of the circumstances. Thus, the court, on remand, will need to make a specific finding that the police went to the apartment for a legitimate purpose, and not with the intent "to obtain [an occupant's] consent as a pretext for conducting a

warrantless search of the home." *See Gandia, supra,* 424 *F.*3d at 262.

The police officers must be able to point to reasonable, articulable suspicion that the premises in which they are present is "harboring a person posing a danger to those on the arrest scene." *Buie, supra,* 494 *U.S.* at 336, 110 *S.Ct.* at 1099, 108 *L.Ed.*2d at 287. Of course,

[n]o mathematical formula exists for deciding whether the totality of the circumstances provided the officer with articulable or particularized suspicion that the individual in question was involved in criminal activity. Such a determination can be made only through a sensitive appraisal of the circumstances in each case. In each case, the reasons for such particularized suspicion will be given careful scrutiny by the Court. A seizure cannot—we emphasize cannot—be justified merely by a police officer's subjective hunch.

[*State v. Pineiro,* 181 *N.J.* 13, 27, 853 *A.*2d 887 (2004) (quoting *State v. Davis,* 104 *N.J.* 490, 505, 517 *A.*2d 859 (1986)).]

That familiar and long-standing standard should not prove difficult for law enforcement officers to meet, or for courts to review. In the calculus of determining reasonable articulable suspicion to justify a protective sweep of a home based on consent, this factor presents two requirements: first, that the police possess a reasonable articulable suspicion that another person is present; and second, that the person is likely a danger to those at the scene.

To satisfy this factor, the on-the-scene officers must be able to point to specific facts demonstrating the reasonable belief that there is another person within the apartment. In other jurisdictions, this requirement has been deemed met where visible or auditory observations either before or after entering the premises indicate that an additional unseen person or persons are present. *See, e.g., Taylor, supra,* 248 *F.*3d at 510, 514 (upholding protective sweep where officers heard shuffling noises prior to entering apartment "suggesting that more than one person was present"). It seems fairly obvious that the requirement for visible or auditory observation of human presence will require officers to formulate such reasonable articulable suspicion of human presence *after* they have arrived at the property. *See Gould, supra,* 364 *F.*3d at 589–90 (expressing concern over use of protective sweep in certain

circumstances "without anything having developed since entry suggestive of greater or more imminent danger than that initially apparent just prior to entry"). Mere presence of a person is not sufficient, however; officers also must articulate a basis for believing that the person present is dangerous before they may conduct a sweep. *See Buie, supra,* 494 *U.S.* at 334, 110 *S.Ct.* at 1098, 108 *L.Ed.*2d at 286. Most often, this requirement will be addressed as part of a totality-of-the-circumstances analysis. That analysis must point to individualized, rather than generalized, suspicion. Considerations may include such obvious circumstances as pre-existing police knowledge that a specific individual is a dangerous or violent criminal, combined with surprise once police are on the premises, as occurred in *Gould, supra,* 364 *F.*3d at 591–92; or overly nervous conduct, combined with inconsistent or dishonest responses to inquiries that lead police to suspect a dangerous individual is being concealed, as occurred in *Caraballo, supra,* 595 *F.*3d at 1225.

As for the search itself, it must be demonstrated to have been "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Buie, supra,* 494 *U.S.* at 327, 110 *S.Ct.* at 1094, 108 *L.Ed.*2d at 281. Thus, even if a protective sweep is justified on all other fronts, it "is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found." *Id.* at 335, 110 *S.Ct.* at 1099, 108 *L.Ed.*2d at 287 (footnote omitted). Unlike a *Terry* or *Long* stop which is designed to ferret out weapons that might be used against police officers, the protective sweep is aimed at protecting officers from dangerous *individuals.*

Finally, the protective sweep must be restricted in duration. To accomplish its permitted purpose, and no other, it can last "no longer than is necessary to dispel the reasonable suspicion of danger," and last no longer than the reasonable duration of the legitimate purpose for the police presence. *See id.* at 335–36, 110 *S.Ct.* at 1099, 108 *L.Ed.*2d at 287.

In the present matter, as previously stated, we are satisfied that there was sufficient evidence for the trial court to find that the officers entered the apartment due to the consent of Jayaad Brown. However, questions remain concerning the legitimacy of the investigative technique employed. On remand we direct the trial court to consider specifically whether the knock-and-talk technique employed by the officers was a pretext to gain access to the apartment to conduct an unconstitutional search, and not to speak to the occupants. We have serious reservations arising from our disagreement with the court's observation that the officers possessed articulable suspicion to justify the search of the apartment based on the following factors:

[1] The police were investigating a ruthless double murder which occurred, in part, in Newark.

[2] The murders were committed with a gun.

[3] The murders occurred within the preceding 48 hours.

[4] The murders were committed by several African–American males.

[5] The gun used in the commission of the murders was missing.

[6] The apartment in question was in Newark.

[7] A cellular telephone connected to the murders was being used to call the apartment in Newark where the police were present investigating the double murder.

With the exception of the seventh factor—the use of the cellular telephone to call the apartment—those observations, if deemed sufficient to meet the standard for a protective sweep, would have justified a warrantless search of any apartment within the City of Newark. Not even the seventh factor justifies the search that occurred: the communications data warrant demonstrated telephone calls to twenty or thirty numbers. We cannot imagine that the police would have been justified in searching each property associated with those numbers. Thus, the factors established by the trial court, though relevant, are insufficient in the aggregate to justify the level of invasion that occurred in this case.

Because the trial court that decided defendant's motion to suppress did so without the benefit of this opinion, and because the record as developed does not address directly, let alone satisfy, the standard announced today to govern the use of protec-

tive sweeps, we reverse and remand for supplemental proceedings to determine whether the police entry can be shown to meet the directives contained herein.

## VII.

The judgment of the Appellate Division is reversed, and this matter is remanded for further proceedings consistent with this opinion.

*For reversal and remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA-SOTO and HOENS—7.

*Opposed*—None.