NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-5600-12T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

DION E. ROBINSON, a/k/a
QUANTAE MASON ALBERT MITCHELL,

    Defendant-Appellant.

_____

**APPROVED FOR PUBLICATION**

**May 21, 2015**

**APPELLATE DIVISION**

Argued March 24, 2015 — Decided  May 21, 2015

Before Judges Fisher, Nugent and Accurso.

On appeal from Superior Court of New Jersey,
Law Division, Atlantic County, Indictment
Nos. 12-05-1236 and 12-03-0627.

Amira R. Scurato, Assistant Deputy Public
Defender, argued the cause for appellant
(Joseph E. Krakora, Public Defender,
attorney; Ms. Scurato, of counsel and on the
brief).

Jane C. Schuster, Deputy Attorney General,
argued the cause for respondent (John J.
Hoffman, Acting Attorney General, attorney;
Ms. Schuster, of counsel and on the brief).

The opinion of the court was delivered by

ACCURSO, J.A.D.

Following the denial of his motion to suppress evidence seized in a warrantless search of his car, defendant Dion E. Robinson entered a negotiated plea of guilty to second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5b, and was sentenced to a prison term of five years, with a mandatory three-year period of parole ineligibility. Defendant appeals from the denial of his motion to suppress the handgun, renewing his argument to the trial court that the police were required to obtain a warrant before searching his car. We agree and reverse the denial of the motion.

The only witness at the suppression hearing was the arresting officer. According to the officer, he was on routine patrol in Galloway Township at approximately 12:55 a.m. when he noticed defendant's car pull onto the highway from a motel parking lot in "a high-crime, high-drug area." The officer watched as the driver twice activated his right turn signal, first to turn into a convenience store and then to enter a jug handle for a U-turn, only to quickly cut back into his lane both times. Although acknowledging that the driver signaled the lane change back onto the highway each time, the officer termed the

2

conduct a "little suspicious."[1]  He followed the car onto the

Garden State Parkway and initiated a motor vehicle stop after he

noticed an air freshener hanging from the interior rearview

mirror that "appeared it could have been a windshield

obstruction."

Upon approaching from the passenger side, the officer found

four young black people in the car.  Defendant, who was driving,

immediately handed over the car registration and insurance card

and said his license was suspended.  The car did not belong to

any of the occupants, and none could provide the name of the

owner.  The officer, noticing an open beer bottle in the back

seat and that no one was wearing a seat belt, asked the

passengers for identification as well.  Two of the passengers

produced identification cards, neither having a driver's

license.  All were cooperative.[2]

---

[1] Later in his testimony, the officer said that the driver had
not signaled as he returned to the highway either time.  He did
not, however, consider those movements a motor vehicle
violation. "I just thought it was suspicious, suspicious, not
because of [] motor vehicle violations, but I don't know why
they'd be doing something like that."

[2] Although the officer noted in his report that the occupants had
given conflicting statements, he clarified in his testimony that
the statements were actually consistent.  The conflict was the
officer's assessment that the route "in which they were going
was suspicious and is conflicting with the general way you would
go to Vine Avenue from where they were."

3

When the officer returned to his patrol car to radio dispatch with the information he had obtained from the group, he learned that defendant and one of the men in the backseat, Terron Henderson, had open warrants and that both were known to carry weapons.[3] The officer called for backup and a decision was made to "proceed tactically and in a high-risk fashion." Four additional cars quickly arrived and all five officers approached the car with guns drawn. Defendant and Henderson were arrested, searched, handcuffed and placed into patrol cars without incident. No contraband was found on either man. The other two passengers, the ones without drivers' licenses, were also removed at gunpoint, patted down for weapons and detained on the side of the road, away from the car.

After all of the occupants had been removed and defendant and Henderson arrested, the officer testified that his sergeant directed him to "conduct a sweep of the interior of the vehicle . . . [t]o check for weapons." According to the officer, he

---

[3] The officer later learned that the two men had misidentified themselves, each claiming the name of the other. The officer testified that dispatch informed him "Mr. Henderson had a traffic warrant and Mr. Robinson had an outstanding NCIC (National Crime Information Center) hit warrant for a drug offense." The officer testified it made sense to him when dispatch said defendant was known to carry weapons, because he saw the NCIC hit, but "[w]here they got the information on Mr. Henderson, I don't know."

4

checked under the front seats and "common areas where a weapon could be hidden." When he lifted the purse the front seat passenger had left on her seat, he felt a heavy object in the bottom. Touching it, he could feel the outline of a gun. The officer opened the purse and retrieved a loaded .38 caliber revolver. The officers placed the other two passengers under arrest, towed the car and obtained a search warrant for the vehicle. Nothing further was recovered.

The judge determined the officer lawfully stopped the car based on defendant having committed, in the officer's judgment, "a number of motor vehicle offenses as evidenced by the motor vehicle summonses ultimately issued in the case," namely unsafe lane change, windshield obstruction and careless driving. The judge concluded that the information the officer received from dispatch, that defendant and Henderson had outstanding warrants and were known to carry weapons, gave the officer ample reason to have ordered the men out of the car. Finding that the officer had a reasonable suspicion that defendant was armed and dangerous, the judge concluded that it was

> certainly reasonable to believe that the
> weapon may have been located somewhere
> within the vehicle, possibly hidden in a
> purse or certainly secreted on top of a car
> seat or anywhere else, and that certainly is
> reasonable for officers to want to protect
> themselves and the public . . . .

5

As such, the court concludes the State has demonstrated by a preponderance of the credible evidence that the motor vehicle stop was lawful and appropriate. The police acted reasonably in the totality of the circumstances in performing the protective sweep, so-called <u>Terry</u>[4] frisk, of the interior of the car, and the . . . purse for officer's safety and the protection of the public and, as such, falls within the exception to the warrant requirement including the evidence of crime, namely, the handgun shall be admissible in trial against the defendants.

Our review begins with familiar principles. We defer to the trial court's factual findings on a motion to suppress unless they were "clearly mistaken" or "so wide of the mark" that the interests of justice require appellate intervention. <u>State v. Elders</u>, 192 <u>N.J.</u> 224, 245 (2007). Our review of the trial court's application of the law to the facts, however, is plenary. <u>State v. Rockford</u>, 213 <u>N.J.</u> 424, 440 (2013).

Because the parties agree on the facts, our focus, like theirs, is on the judge's application of the law to those established facts. The State argues, as it has since the inception of the matter, that the protective sweep and plain-feel exceptions to the warrant requirement justified the warrantless search of the car. It also contends that defendant lacked the requisite expectation of privacy in his passenger's

---

[4] <u>Terry v. Ohio</u>, 392 <u>U.S.</u> 1, 21, 88 <u>S. Ct.</u> 1868, 1880, 20 <u>L. Ed.</u> 2d 889, 906 (1968).

6

purse to challenge the search. Defendant contends that the protective sweep doctrine does not apply to automobiles and that the police needed to obtain a warrant before searching his car.

After the judge rendered his decision, and the parties filed their briefs in this court, the Supreme Court issued its decision in State v. Gamble, 218 N.J. 412 (2014), limning the permissible protective sweep of the passenger compartment of an automobile.

Gamble arose out of two anonymous late night 9-1-1 calls, the first reporting "shots fired" and the second, an individual sitting in a tan van with a gun on his lap. Id. at 419. When officers responded to the high-crime neighborhood, they spotted the van and approached with guns drawn. Ibid. The officers watched the two occupants move frantically about as they neared and ordered the men out of the van. Ibid. The passenger did as directed, but the driver, after starting to comply, attempted to duck back into his seat. Id. at 420. Fearing that the driver could have been going for a gun, one of the officers struck the driver and pulled him from the vehicle. Ibid. Officers frisked the men for weapons but found nothing. Ibid.

Neither man was under arrest at that point. Before allowing the men to return to the van, one of the officers went to search the interior. Ibid. The officer testified that as he

7

entered the vehicle, he saw the handle of a handgun sticking up from the center console. Ibid.

After reviewing federal and State law regarding the protective sweep exception to the warrant requirement, the Court applied the doctrine to the facts before it. First, the Court found that the 9-1-1 calls, corroborated by the police finding the van in the location it was reported, combined with the high-crime neighborhood, the late hour and the furtive movements of the occupants as the officers approached, created a reasonable suspicion sufficient to justify the investigatory stop. Id. at 431. Those circumstances, in addition to the driver's retreat to his seat after the officers had ordered him out of the van, created reasonable suspicion "that defendant was dangerous and could gain immediate access to a weapon, specifically the handgun that had been reported in the 9-1-1 call." Id. at 432.

Turning to the protective sweep of the van, the Court noted that it occurred only after the frisk of the van's occupants revealed that neither carried a weapon. Ibid. Because of the circumstances that had precipitated the officers' arrival on the scene and the men's conduct, the frisk, however, heightened rather than allayed the officers' concern that there was a gun in the van that would be easily accessible to the men when allowed to return to the vehicle. Ibid. Considering those

8

circumstances, the Court held that the same rationale of allowing a cursory visual inspection for the safety of police officers that had justified protective sweeps of a home in Maryland v. Buie, 494 U.S. 325, 327, 110 S. Ct. 1093, 1094, 108 L. Ed. 2d 276, 281 (1990) and State v. Davila, 203 N.J. 97, 116 (2010), "applies equally to limited protective searches of vehicles, where officers are permitted to 'ferret out weapons that might be used against police officers.'" Gamble, supra, 218 N.J. at 433 (quoting Davila, supra, 203 N.J. at 129).

Based on the confluence of the facts before it, the Court concluded that "once the officer completed the pat down of defendant and did not locate the gun, it was reasonable for the officer to believe the van contained a gun. To permit defendant and his passenger to reenter the van before ensuring that it did not contain a weapon ignores the risk to officers and public safety." Id. at 434. It thus determined that "the narrowly confined visual sweep of the passenger compartment, which revealed a handgun protruding from the center console, was permissible." Id. at 433.

Applying the rationale of Gamble to the established facts, we think it clear the search of defendant's car was impermissible. The police arrested defendant and Henderson after learning from dispatch the men had open warrants. The

9

searches of their persons were conducted incident to arrest. See State v. Dangerfield, 171 N.J. 446, 461 (2002) (describing purpose and scope of contemporaneous search incident to arrest exception to the warrant requirement). Unlike the driver and passenger in Gamble, defendant and Henderson were handcuffed and placed in patrol cars; neither was going to return to the car where there might be a weapon they could use against the officers.

The other two passengers, while not under arrest, were not licensed to drive. Although the arresting officer conceded "in hindsight" that none of the occupants was going to be allowed to drive the car away, he testified "that was not the first thing on my mind. I would have figured that out after I finished my sweep and made [sure] everything was safe."

The point, of course, is that there was no demonstrable need to sweep the car to make sure everything was safe for the officers after defendant and Henderson had been placed under arrest and secured in patrol cars. See State v. Eckel, 185 N.J. 523, 541 (2006) (holding that a search of a passenger compartment of a car incident to arrest cannot be sustained where the occupant has been "arrested, removed[,] and secured elsewhere," because the potential for obtaining a weapon has been eliminated).

10

Unlike in Gamble, neither the searches of defendant and Henderson, nor the protective frisks of the two unlicensed passengers reasonably heightened the officers' concerns for the presence of a weapon in the car that could be used against them. Although dispatch reported that defendant and Henderson were known to carry weapons, there were no reports of anyone seeing a weapon in their possession that evening or hearing shots fired in their vicinity. The officer did not observe furtive movements upon his initial approach as if the occupants might be trying to conceal a weapon. And none of the occupants made any attempt to retreat to the car as if trying to get at a gun. The officer testified that all of the occupants of the car were calm and cooperative. In short, there were no facts to give rise to a reasonable suspicion that the car contained a gun, and, more importantly, that the unlicensed passengers posed a danger to the officers requiring a protective sweep of the car after the arrest of defendant and Henderson.[5]

At argument before us, the State contended that the officer's protective sweep was reasonable because the unlicensed

_____

[5] Because we conclude the officer's protective sweep of the car constituted an unlawful search, the State's argument that the seizure of the handgun was justified under the plain-feel doctrine is unavailing. State v. Johnson, 171 N.J. 192, 206 (2002) (noting plain view doctrine requires the officer to lawfully be in the viewing area).

11

occupants would have been allowed to return to the car to await rescue by a licensed driver or to retrieve their belongings. We reject this argument. First, the officer did not testify that he intended to allow the unlicensed drivers to return to the car for any reason. This stop was conducted on the Garden State Parkway after midnight. The officer several times referred to that fact and its significance for the safety of the officers and the occupants of the car.[6]

Second, there was no testimony that the unlicensed occupants asked to return to the car to retrieve their belongings. We cannot speculate about what might have occurred had the officer chosen not to sweep the car. What we have is the officer's testimony that his sergeant directed him to sweep the car after defendant and Henderson were handcuffed, and that he did so without considering that the unlicensed passengers would not be driving the car away. When pressed on cross-examination for justification of the sweep under those circumstances, the officer offered, "[b]ecause as far as I'm aware, there's still two people unhandcuffed, there could still have been a weapon in the car that someone could have access to

---

[6] For example, referring to his initial approach to the car, the officer explained "[t]he Garden State Parkway is a highway with high speeds, and because it was dark out, I just didn't feel safe approaching from the driver's side."

12

even if I didn't let them back in the car, and I wasn't about to let some other person, whoever we can get to pick up the car, go into the car if there was a weapon in the car."

The Court's carefully crafted opinion in Gamble teaches that there must be facts sufficient to support a reasonable suspicion on the part of the officer of the presence of a weapon within easy reach of a person returning to the vehicle, whom the officer has reasonably concluded poses a danger to the officers or others before a protective sweep of the car can be justified. A review of the transcript makes plain that there were no facts developed on this record to support a reasonable suspicion that the car contained a gun or that the unlicensed passengers posed any threat to the officers. The record on this motion simply does not support the State's argument that the unlicensed passengers would be returning to the car or that their doing so posed any threat to the officers.

We also reject the State's argument that defendant lacked the requisite expectation of privacy in his passenger's purse to successfully challenge the search here. As the officer's testimony made clear, he was searching the passenger compartment of defendant's car, not his passenger's purse. Because defendant's possessory interest in the car in which the purse was found is obvious, the State's argument is plainly without

13

merit.  R. 2:11-3(e)(2).  See State v. Johnson, 193 N.J. 528, 547 (2008) (explaining that in typical case the notion of possessory or proprietary interest in thing searched or item seized is clear and no inquiry into individual's substantive right of privacy is required).

Our dissenting colleague concludes that the search of defendant's car could be justified as either a legitimate protective sweep under Gamble and Michigan v. Long, 463 U.S. 1032, 1051-52, 103 S. Ct. 3469, 3481-82, 77 L. Ed. 2d 1201, 1221-22 (1983), or under the community caretaking doctrine explained in State v. Navarro, 310 N.J. Super. 104, 108 (App. Div.), certif. denied, 56 N.J. 382 (1998).

Here is why we think he is wrong.  Defendant and Henderson, the two occupants of the car with open warrants and the ones known to carry weapons, had been subject to a full custodial arrest and were already secured in the back of separate patrol cars at the time of the officer's search.  There can be no doubt that if they had been the only occupants of the car, this search would have been illegal under both federal and State law.  See Arizona v. Gant, 556 U.S. 332, 343, 129 S. Ct. 1710, 1719, 173 L. Ed. 2d 485, 496 (2009) (holding police may "search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger

14

compartment at the time of the search"[7]); Eckel, supra, 185 N.J. at 541.  The question then becomes how the presence of the two unlicensed occupants might change that clear result.

The dissent focuses on the officer's reasonable suspicion that there still may have been a gun in the car.  Accepting that might be so, we are left to wonder what evidence the police possessed to conclude the unlicensed passengers posed any danger to them.[8]  Michigan v. Long permits an officer to search a car's passenger compartment only when the officer "has reasonable suspicion that an individual, whether or not the arrestee, is 'dangerous' and might access the vehicle to 'gain immediate control of weapons.'"  Gant, supra, 556 U.S. at 346-47, 129 S. Ct. at 1721, 173 L. Ed. 2d at 498 (quoting Michigan v. Long, supra, 463 U.S. at 1049, 103 S. Ct. at 3469, 77 L. Ed. 2d at 1201).

---

[7] The State has not argued the officer's sweep of the car could be justified by Gant's other holding, that is, that police may also search a vehicle incident to an occupant's lawful arrest when it is reasonable to conclude evidence relevant to the crime prompting the arrest might be found there.  Gant, supra, 556 U.S. at 343-44, 129 S. Ct. at 1719, 173 L. Ed. 2d at 496.

[8] The officer testified that after the police ordered the unlicensed occupants out of the car, "[w]e just had them come back.  We patted them down for our safety and had them stand on the side of the road."  He noted that one of the other officers "not knowing the situation," had briefly placed the front-seat passenger in handcuffs.  After the testifying officer explained she was not under arrest, the handcuffs were "immediately removed."

15

Once the police decided to proceed "tactically," the unlicensed passengers, who had cooperated with the police by presenting identification when asked, who had no discernible criminal records and who had not engaged in any suspicious behavior or committed any traffic offense, were ordered out of the car at gunpoint and frisked by one of the five officers on the scene. The officer testified they were removed from the car after defendant and Henderson were arrested and searched. The State, which bore the burden of proving the justification for this warrantless search, State v. Brown, 216 N.J. 508, 517 (2014), did not elicit testimony explaining why it was necessary to remove those passengers from the car at that point instead of monitoring them in place, see State v. Smith, 134 N.J. 599, 618 (1994) (holding "an officer must be able to point to specific and articulable facts that would warrant heightened caution to justify ordering the occupants to step out of a vehicle detained for a traffic violation"), or why their pat downs were warranted, see id. at 619 ("to justify a pat-down of an occupant once alighted from a vehicle, specific, articulable facts must demonstrate that a 'reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger'") (quoting Terry, supra, 392 U.S. at 27, 88 S. Ct. at 1883, 20 L. Ed. 2d at 909).

16

The testimony that was elicited made clear beyond doubt that the officer swept the car without first considering whether there was any actual need to do so to ensure officer safety. The officer learned there were no valid drivers in the car before he ever contacted dispatch for a records check.[9] Accordingly, he knew the passengers the police had detained but not arrested would not be driving the car away, yet he failed to consider the implication of that fact on the need to make a protective sweep of the car. Sweeping a car reflexively for officer safety in the absence of a genuine safety concern transforms a protective sweep from an exception to the warrant requirement to a police entitlement, a result the United States Supreme Court has termed anathema to the Fourth Amendment. See Gant, supra, 556 U.S. at 347, 129 S. Ct. at 1721, 173 L. Ed. 2d at 499.

The officer having swept the car before considering whether the unlicensed passengers would be allowed to return to it, the State was reduced to engaging in a game of "what if" with the officer in order to save the search - what if the passengers

_____

[9] The officer testified he "asked for the documents after I realized they weren't wearing their seatbelts. . . . I generally don't ask everyone for the IDs, but seeing some minor violation and knowing the driver had no license, I figured I would ask for a license to see maybe if they could at least have a valid driver."

17

wanted to leave the scene, what if they wanted to retrieve their belongings from the car.[10] The problem, obviously, is that none of those things actually occurred, and we cannot know what might have happened had the officer chosen a different course.

Our dissenting colleague has fallen prey to the same trap, concluding on the basis of one such hypothetical exchange that had they not found the weapon, "the officers would not have had the vehicle towed," post at ___ (slip op. at 7), ignoring that at the time he conducted his sweep, the officer did not know whether the occupants were lawfully in possession of the car and that the officer also testified he "would have taken the time to at least try and contact the registered owner to see who [the car] belonged to and ensure that it was supposed to be in one of their hands." The dissent concludes that because the police would not have towed the car and the passengers would have been

─────────────────────

[10] After referring to testimony by the officer on cross-examination conceding the unlicensed drivers would have had no reason to go back into the car "except to retrieve belongings, if they had any," the prosecutor asked him on re-direct, "Is it fair, then, that [the front-seat passenger] would have been able to go back into that vehicle[,] had you not found the gun[,] and retrieve her purse?" The officer responded, "Yes, that's fair to say." A similar exchange took place regarding whether the front-seat passenger would have been free to leave the scene, retrieving her belongings before she departed. These forays are ridiculous to us. How exactly would the passenger have departed the side of the Parkway after 2 a.m. without a car, and what was the likelihood of her asking to retrieve her purse with the loaded .38 inside, or better yet, asking one of the officers to fetch it for her, before she left?

18

allowed back into the vehicle, two "facts" unknowable to the officer at the time he conducted his search, "the officer's testimony amply supports the trial court's conclusion that the officer reasonably believed a risk remained."[11]  Post at ___ (slip op. at 9).

Searches are judged by what the officer knew at the time the search was conducted.  State v. Bruzzese, 94 N.J. 210, 221 (1983) ("Facts learned by the authorities after the search and seizure occurs will not validate unreasonable intrusions."). Accepting, as we do for purposes of engaging our colleague's argument, that a dispatch report that defendant and Henderson were known to carry weapons is sufficient after Gamble to give rise to a reasonable suspicion of a weapon in the car under the circumstances here, it does not suffice to justify this protective sweep under either Michigan v. Long or Gamble.  What is lacking are specific, articulable facts in the record to support what the officer also needed to conclude before conducting his sweep, that the unlicensed passengers were

_____

[11] The dissent relies on other "facts," including that defendant and Henderson had lied to police and that defendant "had been at a motel in an area notorious for drug activity."  Post at ___ (slip op. at 5).  The officer did not learn that the men had lied to him about their names until later.  The only proof that the men had been at the motel was the officer seeing them turn out of the parking lot.  As the stop took place on the Parkway, it might be more accurately said that defendant drove through a high-crime area before he was pulled over.

19

dangerous, and that they could access the car to gain immediate control of the suspected weapon to use against the officer or others.

The judge failed to make any findings on those critical issues because the State failed to elicit the testimony necessary to allow him to do so. In the absence of facts in the record demonstrating the sweep was necessary for the safety of the officers, it cannot be judged objectively reasonable. See Bruzzese, supra, 94 N.J. at 219.

Finally, we reject our colleague's conclusion that this search could be justified under the community caretaking doctrine, a position not urged by the State or considered by the trial court. As the Supreme Court has recently noted, it has applied the doctrine cautiously. State v. Vargas, 213 N.J. 301, 317-19 (2013). In State v. Diloreto, 180 N.J. 264, 282 (2004), it took pains to warn the State against construing its approval of the warrantless search and seizure there as "approving wide application of the community caretaker doctrine" in the setting of a car stop. The Court stated emphatically that "[t]he community caretaker doctrine remains a narrow exception to the warrant requirement," ibid., a position it reaffirmed in Vargas, supra, 213 N.J. at 326 ("Under our state law jurisprudence – outside of the car-impoundment context — warrantless searches

20

justified in the name of the community-caretaking doctrine have involved some form of exigent or emergent circumstances.").

Applying the doctrine here, on the basis of the officer's post hoc justification for the protective sweep when confronted with the fact that the unlicensed drivers would not be taking possession of the car ("I wasn't about to let some other person, whoever we can get to pick up the car, go into the car if there was a weapon in the car"), is unwarranted because there was no exigency and an unwise expansion of the doctrine beyond anything contemplated by the Court to date.  See State v. Bogan, 200 N.J. 61, 77 (2009) (discussing parameters of simultaneous engagement of officers in community caretaking and criminal investigation).

Because we have concluded the protective sweep of defendant's car was not permissible under Gamble, we have no need to consider whether the trial court's finding of an initial lawful stop, supported by a two-inch by three-inch tree-shaped air freshener hanging from the rear-view mirror and two signaled lane changes, is supported by sufficient credible evidence in the record.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

21

**NUGENT, J.A.D., dissenting.**

The Fourth Amendment to the United States Constitution and Article I, paragraph 7 of the New Jersey Constitution prohibit unreasonable searches and seizures. "The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate government interests.'" United States v. Knights, 534 U.S. 112, 118-19, 122 S. Ct. 587, 591, 151 L. Ed. 2d 497, 505 (2001) (quoting Wyoming v. Houghton, 526 U.S. 295, 300, 119 S. Ct. 1297, 1300, 143 L. Ed. 2d 408, 414 (1999)). Applying that standard to its factual determinations, the trial court in the case before us determined that an officer's protective sweep of the car defendant had been driving was reasonable. Finding no error in either the trial court's factual determinations or its application of law to those determinations, I would affirm the denial of defendant's suppression motion.

The issue this court must decide is whether the trial court erred when it determined that the arresting officer had a reasonable articulable suspicion that the car's occupants and the area of the protective sweep posed a danger to himself, the other officers who had arrived on the scene, or the public.

State v. Gamble, 218 N.J. 412, 427 (2014). When making such a determination, a trial court must "take[] into account 'the totality of the circumstances — the whole picture.'" Id. at 431 (quoting United States v. Cortez, 449 U.S. 411, 417, 101 S. Ct. 690, 695, 66 L. Ed. 2d 621, 629 (1981)). In resolving the inquiry, "due weight must be given, not to [the officer's] inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." Terry v. Ohio, 392 U.S. 1, 27, 88 S. Ct. 1868, 1883, 20 L. Ed. 2d 889, 909 (1968).

As the United States Supreme Court recognized in Terry, "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Ibid. And though a mere "hunch" does not create reasonable suspicion, ibid., the level of suspicion required is "considerably less than proof of wrongdoing by a preponderance of the evidence[,]" and "obviously less" than is necessary for probable cause, United States v. Sokolow, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585, 104 L. Ed. 2d 1, 10 (1989) (citation omitted).

In the case before us, these are the facts that led the arresting officer to believe there was a gun in the car at the

2

time he conducted the protective sweep.  At one o'clock in the morning, the car driven by defendant pulled out of a motel located in a "notorious high-crime, high-drug area[]" where there had been a "significant amount of . . . drug and weapons offenses and other vice offenses . . . ."  In response to the officer's questions, defendant falsely identified himself and claimed that he was driving from Atlantic City to Galloway Township without a license, in the car of a friend whose name he did not know, to take home one of the passengers.  Yet, instead of taking a direct route to the passenger's home, defendant drove onto the Garden State Parkway after the officer had begun to follow him.  In addition, when asked where he was coming from, defendant omitted to disclose that he had been at the motel.

Two of the car's four occupants had outstanding warrants, defendant for a drug offense.  Defendant and a passenger were both flagged in the National Crime Information Center (NCIC) database as known to carry weapons.

> The National Crime Information Center is a
> computerized database of criminal justice
> information available to law enforcement
> agencies nationwide. . . .
>
>     . . . .
>
> NCIC is available to more than 90,000 local
> law enforcement and criminal justice
> agencies twenty-four hours a day, 365 days a

3

year . . . . In 2007, there were more than 1.8 billion NCIC queries, with an average of more than five million each day.

Underlying those transactions is a concern for the safety of police officers, who are at risk when they approach individuals during a traffic stop. See United States v. Finke, 85 F.3d 1275, 1280-81 (7th Cir. 1996) (finding that concerns for officer safety supported criminal history check during traffic stop). The tragic reality is that "a significant percentage of murders of police officers occurs when the officers are making traffic stops." Pennsylvania v. Mimms, 434 U.S. 106, 110, 98 S. Ct. 330, 333, 54 L. Ed. 2d 331, 337 (1977) (per curiam) (internal quotation marks and citation omitted); see also United States v. McRae, 81 F.3d 1528, 1535-36 n.6 (10th Cir. 1996). In 2005, ten officers throughout the country were killed while conducting traffic stops. FBI, U.S. Dep't of Justice, Law Enforcement Officers Killed and Assaulted, 2005 (2006). In New Jersey alone, more than 250 officers were assaulted during traffic stops in 2006.

[State v. Sloane, 193 N.J. 423, 433-34 (2008) (citations omitted).]

Considering the "whole picture," I cannot conclude the trial court erred in determining the arresting officer had a reasonable articulable suspicion that defendant possessed a gun based on "the specific reasonable inferences which [the officer was] entitled to draw from the facts in light of his experience." Terry, supra, 392 U.S. at 27, 88 S. Ct. at 1883, 20 L. Ed. 2d at 909.

4

In Gamble, the Court recounted "objective facts" that, combined with furtive movements, could give rise to an officer's reasonable suspicion. 218 N.J. at 430. The factors included evasive action, lying to the police, other incriminating information about the driver or occupants of the car, absence of identification, and the lateness of the hour. Ibid. Further, "the high-crime nature of [an] area" may also contribute to that suspicion. State v. Valentine, 134 N.J. 536, 553-54 (1994).

Here, the officer did not see defendant or any of his passengers make any furtive movements. However, that defendant had been at a motel in an area notorious for drug activity was not insignificant. Our Supreme Court has commented on the connection between drug activity and guns. See State v. Spivey, 179 N.J. 229, 240 (2004) (quoting Report to the Governor by Attorney General on the Need to Update the Comprehensive Drug Reform Act of 1987 (Dec. 9, 1996)) ("'Firearms have become ubiquitous in the world of illegal drug activity. Dealers are armed to protect themselves from law enforcement officers, from other dealers and from their customers.'"). In addition, other judicially recognized "factors" supported the officer's reasonable suspicion, including defendant's evasive action, lying, and the lateness of the hour. Furthermore, defendant had an outstanding warrant for a drug offense and was flagged in the

5

NCIC as known to carry a weapon. The officer's suspicion, based on the totality of the circumstances, that is, the whole picture, was not unreasonable.

The majority points out that, though defendant and another of the car's occupants were known to carry weapons, there were no reports of anyone seeing a weapon in their possession or hearing shots fired. But the police officer in Terry had no information that the suspects he was observing were carrying guns; he feared the men "may have a gun" because their "elaborately casual and oft-repeated reconnaissance of [a] store window" at 2:30 in the afternoon led him to believe the men were "casing a job, a stick-up." Terry, supra, 392 U.S. at 6, 88 S. Ct. at 1872, 20 L. Ed. 2d at 898. I fail to discern a legally significant reason for differentiating between the experience of an officer who suspects three people are armed because they are "casing a job, a stick-up," in the middle of the afternoon, from that of an officer who has observed four occupants of an automobile leave a motel in an area notorious for drugs at 1:00 in the morning, one of whom has an outstanding warrant for drugs and two of whom have been flagged in the NCIC database as known to carry guns.

The arresting officer having had a reasonable articulable suspicion to believe the occupants or the area to be swept

6

presented a danger, namely a gun, there are two reasons why the protective sweep was justified: two passengers posed a potential threat to the officers if permitted to return to the car to obtain their belongings; and the need to protect the public outweighed defendant's privacy interest in the car and justified the protective sweep as part of the officer's community caretaking function.

The majority concludes the passengers who were not arrested posed no threat to the officers because the arresting "officer did not testify that he intended to allow the unlicensed drivers to return to the car for any reason[,]" and because "there was no testimony that the unlicensed occupants asked to return to the car to retrieve their belongings."  Ante at ___ (slip op. at 12).  But the arresting officer's reasonable suspicion concerning a gun "did not evaporate when [he] failed to find a weapon on either defendant or [the] passenger[s].  The risk to officers and public safety . . . is equally present here."  Gamble, supra, 218 N.J. at 433.  Moreover, there was evidence to support a contrary factual determination concerning the passengers who had not been arrested.

The evidence established that the officers would not have had the vehicle towed.  The officer who testified at the suppression hearing made that fact clear:

7

Q.    But prior to making this protective sweep, you would have to make the determination that you were impounding the car, so you didn't need to do a protective sweep.

A.    I had no reason to impound the car.  As far as I was aware, it was validly registered and insured.

Q.    But there were no licensed drivers.

A.    Right.  It's not a policy to impound vehicles just because there's a suspended driver and no one could drive it.  If they're comfortable leaving it somewhere safe off the side of the road or if we can get another licensed drive to respond to the scene, that would be fine.  Generally, we only tow unregistered or highly disabled vehicles.

Q.    So they would have no reason to go back into the car, right?

A.    Correct, except to retrieve their belongings, if they had any.

The officer confirmed his testimony on redirect examination

by the prosecutor:

Q.    Officer, [defense counsel] asked you some questions about whether or not there was anyone who would have been able, of the four occupants of the vehicle, she asked you a question about whether any of them would have been able to actually drive the vehicle away.  Do you remember that line of questioning?

A.    Right.

Q.    And I believe your answer was that, no, that was for once you conducted

8

subsequent investigation, you were able to confirm that those four would not have been able to drive it away; however, they could have retrieved their belongings.

A. Right.

Q. Is it fair, then, that [the female passenger] would have been able to go back into that vehicle had you not found the gun and retrieve her purse?

A. Yes, that's fair to say.

Q. And her purse contained a loaded handgun?

A. Right.

Thus, the officer's testimony amply supports the trial court's conclusion that the officer reasonably believed a risk remained.

Moreover, the United States Supreme Court has rejected the notion that if a person subject to a Terry stop is under police control, then police may not conduct a protective sweep of the person's automobile:

> The Michigan Supreme Court appeared to believe that it was not reasonable for the officers to fear that Long could injure them, because he was effectively under their control during the investigative stop and could not get access to any weapons that might have been located in the automobile. See 413 Mich., at 472, 320 N. W. 2d, at 869. This reasoning is mistaken in several respects. During any investigative detention, the suspect is "in the control" of the officers in the sense that he "may be briefly detained against his

9

will . . . ." Terry, supra, at 34 (WHITE, J., concurring).  Just as a Terry suspect on the street may, despite being under the brief control of a police officer, reach into his clothing and retrieve a weapon, so might a Terry suspect in Long's position break away from police control and retrieve a weapon from his automobile.  See United States v. Rainone, 586 F.2d 1132, 1134 (CA7 1978), cert. denied, 440 U.S. 980 (1979). In addition, if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside.  United States v. Powless, 546 F.2d 792, 795-796 (CA8), cert. denied, 430 U.S. 910 (1977).  Or, as here, the suspect may be permitted to reenter the vehicle before the Terry investigation is over, and again, may have access to weapons.  In any event, we stress that a Terry investigation, such as the one that occurred here, involves a police investigation "at close range," Terry, 392 U.S., at 24, when the officer remains particularly vulnerable in part because a full custodial arrest has not been effected, and the officer must make a "quick decision as to how to protect himself and others from possible danger . . . ." Id., at 28.  In such circumstances, we have not required that officers adopt alternative means to ensure their safety in order to avoid the intrusion involved in a Terry encounter.

[Michigan v. Long, 463 U.S. 1032, 1051-52, 103 S. Ct. 3469, 3481-82, 77 L. Ed. 2d 1201, 1221-22 (1983).]

Apart from the risk posed by the car's occupants, "[i]t is now well recognized that in addition to investigating crimes, the police also engage in what has been 'described as community caretaking functions, totally divorced from the detection,

10

investigation, or acquisition of evidence relating to the violation of a criminal statute.'"  State v. Navarro, 310 N.J. Super. 104, 108 (App. Div.) (citation omitted)  (quoting Cady v. Dombrowski, 413 U.S. 433, 441, 93 S. Ct. 2523, 2528, 37 L. Ed. 2d 706, 715 (1973)), certif. denied, 156 N.J. 382 (1998).  Here, the trial judge determined that the officer acted reasonably not only to protect himself, but also to protect the public.  This determination is supported by ample credible evidence in the record.  As the majority has recounted, when asked if there was a need to do a protective sweep while two of the car's occupants were handcuffed and the other two were standing on the side of the road in the presence of other officers, the officer who conducted the protective sweep testified that there was such a need:

> Because as far as I'm aware, there's still two people unhandcuffed, there could still have been a weapon in the car that someone could have had access to even if I didn't let them back in the car, and I wasn't about to let some other person, whoever we can get to pick up the car, go into the car if there was a weapon in the car.

The officer reasonably believed that "there could still have been a weapon in the car that someone could have had access to."  Under those circumstances, the officer's protective sweep was reasonable.

11

As the trial court properly stated, quoting Knights, supra, 534 U.S. at 118-19, 122 S. Ct. at 591, 151 L. Ed. 2d at 505, "the reasonableness of a search is determined by assessing on the one hand the degree to which it intrudes upon an individual's privacy, and, on the other hand, the degree to which it is needed to promote legitimate governmental interests." When defendant's privacy interest in a car that he was unlicensed to drive, that he did not own, and that was owned by a person he could not name, is balanced against an officer's reasonable articulable suspicion that there is a gun in the car that could come into the possession of an innocent or not-so-innocent person, the balance tips in favor of the State.

For the foregoing reasons, I would affirm the trial court's denial of defendant's suppression motion.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

12