**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4582-18

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

SAQUAN J. WEAVER,

    Defendant-Appellant.

_____

Submitted February 8, 2021 – Decided April 6, 2021

Before Judges Messano, Suter and Smith.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Indictment No. 18-09-1504.

Joseph E. Krakora, Public Defender, attorney for appellant (John Douard, Assistant Deputy Public Defender, of counsel and on the brief).

Bradley D. Billhimer, Ocean County Prosecutor, attorney for respondent (Shiraz Deen, Assistant Prosecutor, on the brief).

PER CURIAM

Following an evidentiary hearing and denial of his motion to suppress, defendant Saquan J. Weaver pled guilty to second-degree eluding, N.J.S.A. 2C:29-2(b), and second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1), and one count in each of two other indictments. In accordance with the plea bargain, the judge imposed concurrent sentences aggregating in a term of eight-years imprisonment with a forty-two-month period of parole ineligibility pursuant to the Graves Act, N.J.S.A. 2C:43-6(c).

Defendant appeals and raises the following points for our consideration:

> POINT I
>
> THE WARRANTLESS ENTRY INTO THE HOME AND THE SUBSEQUENT SEARCH UNDER THE MATTRESS FAILED TO SATISFY ANY EXCEPTIONS TO THE WARRANT REQUIREMENT, THEREBY VIOLATING THE FEDERAL AND STATE PROTECTIONS AGAINST UNREASONABLE SEARCHES AND SEIZURES.[1]
>
> POINT II
>
> THE EIGHT-YEAR PRISON TERM WAS MANIFESTLY EXCESSIVE.

We affirm.

---

[1] We eliminated the sub-points in defendant's brief, but we will discuss each argument raised in our opinion.

I.

Barnegat Township Police Detective Gregory Martinez was assigned to the Narcotics Unit and had participated in "[h]undreds" of narcotic-related investigations. At approximately 3:20 p.m. on July 13, 2018, he was conducting surveillance at the Barnegat Wawa, "a high narcotics traffic area." Martinez saw defendant, who he immediately recognized from prior police investigations, driving a white Tucson with Ontario, Canada, license plates; a female passenger, who Martinez also recognized from prior police contact, was in the car. Martinez knew at least one prior investigation involved defendant's possession of a firearm, and he also knew that defendant's driver's license was suspended. Additionally, a confidential informant had told Martinez "very recent[ly]" that he saw defendant with a weapon. Martinez later testified that defendant was a victim in a shooting in May or June, and the informant described a particular weapon he saw in defendant's possession about the same time.

Martinez was in an unmarked car without emergency lights, so, when defendant drove away, the detective called in other units to effectuate a motor vehicle stop. Martinez exited his car as two uniformed officers stopped the Tucson on a dead-end street. When asked for his credentials, defendant drove forward, executed a K-turn, and came back toward the officers at thirty-to-thirty-

3

five miles per hour. Martinez testified that as the officers scrambled for safety, the car passed within a few feet of them. The officers returned to their vehicles but were unable to pursue defendant who was already out of sight. They broadcast a description of defendant and the car.

Within "a couple [of] minutes," another officer located the Tucson parked in front of a home on Mast Drive. Martinez testified the address was "a known location" for defendant, and home of a woman who was pregnant with defendant's child. The passenger Martinez saw earlier driving with defendant was standing next to the Tucson, speaking with other officers. She denied knowing where defendant was and claimed she did not know why he "ran."

Martinez said a "concerned citizen" told police that defendant exited the Tucson and ran into the Mast Drive house. As police approached the front door, the owner came outside. She said defendant was not inside but told Martinez he could go in and look. Martinez did not review a "standard consent . . . form" with her prior to entering the home. He estimated that between five to eight minutes had passed since defendant fled from the motor vehicle stop.

Together with Sergeant Andrew Parsley and two uniformed officers, police cleared each room. Martinez and Parsley entered a bedroom and saw "a large bulge underneath the mattress. It seemed like someone was hiding

A-4582-18

underneath there." Martinez lifted the mattress and "immediately recognized [a] silver handgun as well as a large blue case . . . underneath the bed." In response to the judge's questioning, Martinez said the bed was pushed into the corner of the room, against the wall, and "[i]t was like somebody was trying to hide in between the wall and underneath the bed." The blue case was a plastic gun case.

Martinez did not seize this evidence at the time, but rather continued to another bedroom and adjoining bathroom. A young woman was using the bathroom at the time, so police closed the door and waited outside until she was finished and left. Police found defendant hiding behind a shower curtain in the bathroom. After arresting defendant and securing the Mast Drive home, police applied for and obtained a search warrant for the premises. They seized a total of three handguns, including the one seen earlier under the mattress, the gun case and ammunition, including hollow point bullets.

Defendant called Sergeant Parsley as a witness. He was uninvolved in, but aware of, the events prior to police arriving at the Mast Drive house. Parsley, who had ten years' experience as the Ocean County SWAT commander, formulated a plan for entry with the seven or eight police officers he said were at the scene.

5

Parsley confirmed that the owner gave police permission to enter the house, but he also said that if she had denied police access, "we would still have made entry" because of the exigency of the circumstances. Parsley explained that police had reason to believe defendant was inside the house, and considering "the totality of everything," defendant posed a threat to the community and police who were pursuing him. Parsley corroborated much of Martinez's testimony regarding events after police entered the home. He described the lump under the mattress and said the mattress was "displaced enough that . . . [he] thought it could be a person." Parsley later said, in response to a question from the judge, that the lump could have been caused by a person's legs under the mattress.

After considering the parties' briefs and oral argument, the judge issued a short, written statement of reasons supporting the order denying defendant's motion to suppress. He found both witnesses credible and initially rejected defendant's argument that the passage of time between the motor vehicle stop and arrival of police at the Mast Drive home eliminated the exigency of the situation. He also found that the homeowner consented to the search, writing: "Th[e] consent and the exigent circumstances afforded law enforcement the

6

lawful authority to search the residence for [d]efendant and any possible weapons that could be utilized to harm law enforcement or any other occupants."

The judge also addressed defendant's contention that the officers acted unreasonably in lifting the mattress because it was "highly improbable that the detectives could have reasonably thought that the 'bump in the mattress' was [d]efendant, a six[-]foot[,] two[-]hundred pound male." The judge noted the "superficial appeal" of the argument but credited Parsley's testimony that the bump could have been created by someone's legs, finding "that explanation sufficiently credible and . . . law enforcement's conduct was reasonable when viewed in the totality of the circumstances. . . . [L]ifting the mattress to investigate the unknown 'bump' was consistent with insuring officer safety."

## II.

We address seriatim the various arguments defendant makes challenging the warrantless entry and search of the Mast Drive home. "An appellate court reviewing a motion to suppress evidence in a criminal case must uphold the factual findings underlying the trial court's decision, provided that those findings are 'supported by sufficient credible evidence in the record.'" State v. Boone, 232 N.J. 417, 425–26 (2017) (quoting State v. Scriven, 226 N.J. 20, 40 (2016)). "[A] trial court's findings should be disturbed only if they are so clearly

7

mistaken 'that the interests of justice demand intervention and correction.'" State v. A.M., 237 N.J. 384, 395–96 (2019) (quoting State v. Elders, 192 N.J. 224, 244 (2007)). However, we review the motion judge's legal determinations de novo. State v. Hagans, 233 N.J. 30, 38 (2018) (citing State v. Gamble, 218 N.J. 412, 425 (2014)).

Defendant first contends the officers failed to obtain valid consent to enter the house from its owner because she "was not told she had a right to refuse consent and the presence of a large number [of] police officers was inherently coercive." We disagree.

"Both the United States Constitution and the New Jersey Constitution guarantee an individual's right to be secure against unreasonable searches or seizures." State v. Williams, 461 N.J. Super. 80, 94 (App. Div. 2019) (quoting State v. Minitee, 210 N.J. 307, 318 (2012), cert. denied, 241 N.J. 92 (2020)). "[W]e 'accord the highest degree of protection to privacy interests within the home.'" State v. Bryant, 227 N.J. 60, 69 (2016) (quoting State v. Johnson, 193 N.J. 528, 532 (2008)).

Warrantless searches are "presumptively unreasonable," and the State bears the burden of demonstrating the search fell within one of the exceptions to the warrant requirement. Id. at 69–70 (quoting Johnson, 193 N.J. at 552).

Consent to search is a one such "long-recognized" exception. State v. Coles, 218 N.J. 322, 337 (2014).

We recently considered the same argument defendant raises now in Williams. There, police were summoned to assist in a custody dispute and were advised by the caller, who had a court order for custody of her niece, that the child was likely in a nearby apartment with her mother and two uncles, both suspects in a homicide investigation in another municipality. 461 N.J. Super. at 88. Police knocked on the door of the apartment and heard movement and people talking inside before someone finally answered. Ibid. The defendant eventually came to the door, and police advised they were there "for a custody issue" and asked if they could enter. Id. at 89. The defendant agreed and let police in the apartment. Ibid. Once inside, police advised the defendant they believed two fugitives might be in the apartment and asked if they "could conduct a 'protective sweep'"; she "responded, '[s]ure, go ahead.'" Ibid. (alteration in original). The defendant ultimately moved to suppress evidence police seized during their "sweep," arguing "'[p]olice unlawfully entered the apartment without informing [defendant] that she had the right to refuse their entry or the sweep;' and 'unlawfully conducted a protective sweep without any

reasonable, articulable suspicion that the apartment harbored an individual posing a danger[.]'" Id. at 93 (alterations in original).

After surveying prior decisions from our court, and those of other jurisdictions, we concluded "there was no requirement that defendant be advised of her right to refuse entry to the police." Id. at 101. The officer's "decision to knock, request permission to enter, and thereafter enter the apartment for further investigation was entirely reasonable and lawful." Ibid. In this case, we agree with the analysis in Williams and reject defendant's argument that the consent Martinez obtained from the owner of the Mast Drive property was invalid because the detective failed to advise the homeowner she could withhold consent.

Without mentioning our decision in Williams, defendant presents a more nuanced alternative, namely, that even if "the State was not required to establish the officers expressly advised [the homeowner] of her right to refuse consent, . . . the burden remained on the State to demonstrate she knew she had the right to refuse consent." See, e.g., State v. Johnson, 68 N.J. 349, 354 (1975) (holding "in a non-custodial situation," police need not advise the person of his right to refuse to consent to the search, but "if the State seeks to rely on consent as the basis for a search, it has the burden of demonstrating knowledge on the part of

the person involved that he had a choice in the matter"). He also contends that any consent to enter the Mast Drive home was coerced because of the number of officers present.

However, in Williams, we distinguished Johnson, recognizing the distinction between asking permission to enter the home to continue an investigation, as Martinez did here, and requesting specific consent to conduct a search of the premises. 461 N.J. Super. at 98 (citing State v. Padilla, 321 N.J. Super. 96, 108 (App. Div. 1999), aff'd o.b., 163 N.J. 3 (2000)); see also State v. Domicz, 188 N.J. 285, 306 (2006) (rejecting the defendant's argument that his invitation to police to enter his home was compelled and his consent invalid, because "the person who, in the familiar surroundings of his home, can send the police away without fear of immediate repercussions" (citing Schneckloth v. Bustamonte, 412 U.S. 218, 247 (1973))).

In this case, the entry of police into the Mast Drive home was not a "search" and did not require the State to prove anything more than it did, namely, that the homeowner consented to the entry.[2] The issue is whether police had

---

[2] Defendant also asserts in a subpoint of his brief on the issue of consent that "the presence of a large number of police officers was inherently coercive." There is no further mention of the issue. "An issue not briefed on appeal is deemed waived." Sklodowsky v. Lushis, 417 N.J. Super. 648, 657 (App. Div.

authority to conduct a protective sweep of the home once inside. As we explained in Williams, this requires a separate analysis not premised on the consent exception to the warrant requirement.

"[A] 'protective sweep' is a quick and limited search of premises, incident to an arrest[,] and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." State v. Davila, 203 N.J. 97, 113 (2010) (quoting Maryland v. Buie, 494 U.S. 325, 327 (1990)). Our Supreme Court has

> limited the protective sweep of a home to settings in which "(1) police officers are lawfully within private premises for a legitimate purpose, which may include consent to enter; and (2) the officers on the scene have a reasonable articulable suspicion that the area to be swept harbors an individual posing a danger."
>
> [State v. Robinson, 228 N.J. 529, 545 (2017) (quoting Davila, 203 N.J. at 102).]

Even when justified, the sweep must be "conducted quickly[] and . . . is restricted to places or areas where the person posing a danger could hide." Davila, 203 N.J. at 102.

---

2011) (citing Jefferson Loan Co. v. Session, 397 N.J. Super. 520, 525 n.4 (App. Div. 2008)). We also note that "absent from the record are any of the factors" demonstrating coercion. Williams, 461 N.J. Super. at 104 (citing State v. King, 44 N.J. 346, 352 (1965)).

Defendant contends there were no exigent circumstances justifying the officers' entry into the Mast Drive home, but this assertion is premised on a lack of consent to enter, i.e., that police were not lawfully in the house. Indeed, the cases cited by defendant only address those circumstances involving so-called "hot pursuit" of a suspect into a home. Here, as in Williams, police were "lawfully within private premises for a legitimate purpose," 461 N.J. Super. at 102, namely investigating the whereabouts a suspect who minutes earlier eluded and endangered police while driving without a valid license, was known to recently possess firearms, and likely just entered the Mast Drive house, where others might be present.

To satisfy the second standard that justifies a protective sweep, the State must demonstrate the officers, with their particularized knowledge and training and based on the totality of these circumstances, possessed "a reasonable articulable suspicion that the area to be swept harbor[ed] an individual posing a danger." Davila, 203 N.J. at 102. "'That determination is fact-sensitive and requires consideration of whether the totality of the circumstances provided the officer with an articulable and particularized suspicion' warranting the intrusion 'within the context of the officer's relative experience and knowledge.'" Williams, 461 N.J. Super. at 102 (quoting State v. Gamble, 218 N.J. 412, 432

13

(2014)). The motion judge found that the totality of circumstances justified the officers conducting a protective sweep of the house, and we agree.

Lastly, defendant argues that because there was no contraband in "plain view," police "lacked lawful authority to lift the mattress to determine the cause of the lump." Defendant contends that even if police lawfully entered the Mast Drive house to conduct a search for him, they expanded the scope of the permissible search by lifting the mattress, because a reasonable person could not conclude the "lump" was a person in hiding.

Of course, our acceptance of this argument would require us to reject the motion judge's specific finding that Parsley's testimony — he believed the lump could have been caused by the legs of a person — was credible. We will not do so, because not only did the judge have the opportunity to observe both officers' demeanor, Gamble, 218 N.J. at 424–25, but he also posed a plethora of questions to the officers about the size of the room, the location of the bed and mattress with respect to adjoining walls, the position of the mattress on the bed, and the size and shape of the "lump." We owe deference to the judge's legal conclusion based on this testimony, specifically that the officers formed an objectively

14

reasonable belief that the lump they observed under the mattress could be caused by a suspect's legs.[3]

Moreover, given the totality of the circumstances faced by the officers, it was entirely reasonable for them to lift the mattress to ascertain whether a weapon was stowed beneath it that might be accessible to defendant or others in the house. "[W]hen the police act reasonably in the face of genuine exigency,

---

[3] The State did not argue, and the motion judge did not consider, whether lifting the mattress to see what caused the lump was permissible pursuant to the plain view exception to the warrant requirement. Under that doctrine, police may seize an incriminating item or contraband if they are lawfully in the viewing area and the item is immediately apparent as contraband or evidence of a crime. Gonzales, 227 N.J. at 101. Here, as already noted, the officers were lawfully in the bedroom when they observed the mattress, so, for the plain view exception to apply, the critical inquiry would be whether it was objectively reasonable for the officers to associate the "lump," not only with defendant's body, but also with other criminal activity. Id. at 104.

In State v. Johnson, the Court considered whether the seizure of drugs from a hole in the front porch of a house was permissible under the plain view exception to the warrant requirement. 171 N.J. 192, 200–01(2002). The drugs were contained in a "'light-colored' object," ultimately found to be a clear plastic bag containing smaller bags of crack cocaine, but not immediately recognized by the officer as contraband. Id. at 213–14. The Court held that based on the totality of circumstances known to the officer and his experience, he "had probable cause to associate the 'light-colored' object with criminal activity." Id. at 215.

Because the State still has not asserted that the plain view exception justified the officers' actions in this case, we choose not to specifically address its application to these facts.

A-4582-18

their warrantless conduct is sustainable as part of the balancing of interests that constitutes the bulk of our search-and-seizure jurisprudence." State v. Deluca, 168 N.J. 626, 634 (2001). See also State v. Gonzales, 227 N.J. 77, 104 (2016) ("An objectively reasonable search or seizure is constitutional despite an officer's questionable motives, and an objectively unreasonable search or seizure cannot be saved despite an officer's unimpeachable motives.").

We affirm the denial of defendant's motion to suppress.

III.

In accordance with the plea agreement, defendant was sentenced to eight years' imprisonment with a mandatory forty-two-month period of parole ineligibility. The State dismissed the balance of this indictment, and the balances of two other indictments, in each of which defendant entered guilty pleas to one count. The State recommended and the judge imposed concurrent sentences on all convictions. Defendant argues the sentence was excessive, because the judge mentioned defendant's tattoo — "married to the streets" — in finding aggravating factors three, six and nine. See N.J.S.A. 2C:44-1(a)(3) (the likelihood of re-offense); (a)(6) (defendant's prior criminal record); and (a)(9) (the need to deter defendant and others). Defendant argues that the judge erred by according only minimal weight to mitigating factor eleven. See N.J.S.A.

16

2C:44-1(b)(11) (defendant's imprisonment would entail excessive hardship to him or his dependents).

"Appellate review of the length of a sentence is limited." State v. Miller, 205 N.J. 109, 127 (2011). As the Court has said:

> The appellate court must affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [State v. Fuentes, 217 N.J. 57, 70 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364–65 (1984)).]

The judge noted defendant had thirteen prior juvenile adjudications and two prior criminal convictions. The judge viewed the police mobile video recorder of the stop of defendant's vehicle in this case, and described how defendant drove toward the officers, causing them to scatter, and then drove onto the sidewalk and a lawn for a period of time. The judge's fleeting remark regarding defendant's tattoo was an afterthought and had little to do with the finding of aggravating sentencing factors otherwise supported fully by the record. Defendant's excessive sentence argument requires no further discussion. R. 2:11-3(e)(2).

A-4582-18

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

18                                                                    A-4582-18