**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0686-19

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

ALTAREIK R. JOHNSON-
TAYLOR,

     Defendant-Appellant.

_____

Submitted September 13, 2021 – Decided February 22, 2022

Before Judges Fasciale and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment Nos. 18-08-1215 and 19-02-0280.

Joseph E. Krakora, Public Defender, attorney for appellant (Molly O'Donnell Meng, Assistant Deputy Public Defender, of counsel and on the brief; Michael Denny, Assistant Deputy Public Defender, on the brief).

Andrew J. Bruck, Acting Attorney General, attorney for respondent (Deborah Bartolomey, Deputy Attorney

General, of counsel and on the brief; Frank Muroski,
Deputy Attorney General, on the brief).

PER CURIAM

Defendant Altareik R. Johnson-Taylor appeals from his conviction for first-degree conspiracy with a juvenile to commit armed robbery, N.J.S.A. 2C:15-1(a)(1), N.J.S.A. 2C:24-9(a), and N.J.S.A. 2C:2-6; third-degree conspiracy to commit theft, N.J.S.A. 2C:5-2(a)(2) and N.J.S.A. 2C:20-3(a); and second-degree promoting street crime, N.J.S.A. 2C:33-30(a) and N.J.S.A. 2C:20-3(a).

On appeal, defendant challenges the denial of his suppression motion as permitted under Rule 3:4-7(d) relative to the protective sweep of a condominium unit; contends we should retroactively apply the amendment to N.J.S.A. 2C:44-1, which added "youth" as a new mitigating factor; and remand for resentencing. Having considered the arguments and applicable law, we affirm.

I.

The following facts were adduced at the suppression hearing conducted on January 25, 2019, during which East Brunswick Police Detective Joseph Bauer and Officer Nicholas Mauro testified for the State. On May 15, 2017, Officer Mauro responded to a report of a robbery at Crosspointe Condominium development. Upon arrival, he observed officers meeting with two robbery

victims who went to the development to sell a pair of sneakers to two young men. However, the purported purchasers took the sneakers and ran off without paying for them. The victims chased the perpetrators and another individual stepped out and pointed a gun at them, causing the victims to terminate their pursuit.

The victims saw the perpetrators running through the development, and other witnesses observed a group of five or six individuals heading toward unit 347 at Crosspointe Drive. Police officers responded to that address, knocked on the front door, and announced themselves as police officers. They heard noise coming from inside the unit, but no one answered the door. After remaining outside the door for about an hour, knocking and calling a telephone number provided to them for that address, the South River Police Department informed the officers that Tash Augustine, who was being investigated for a similar incident, resided at 347 Crosspointe Drive.

Given they were in a residential area, the officers cleared the surrounding condominium units and set up a perimeter around the residence at issue. The officers knocked again, and this time a young man answered the door. Upon entering, the officers observed seven or eight young men and women matching the description given by the victims sitting on a couch. The police ordered

A-0686-19

everyone to leave the unit and frisked each person for weapons. Then, police called inside the residence to ascertain if anyone was still in there and ordered another individual to come outside. From their vantage point at the threshold of the residence, the officers did not see any weapons but claimed they entered the unit in order to "clear the residence for armed suspects." The officers walked through the condominium, looked in closets, and looked under beds. As Officer Mauro entered the first bedroom on the second floor, he observed a pair of sneakers in a laundry basket.

Upon entering the second upstairs bedroom, the officers saw a large Tupperware clothing container on the floor with a depressed lid, seemingly from someone climbing on top of it, with several metal brackets "pushed down." They also noticed the closet had a door to a crawl space above the shelves. One of the officers entered the crawl space, and using his flashlight, observed what appeared to be a black shotgun. After determining no one was hiding in the crawl space, the officer attempted to clear the shotgun to render it safe but then realized it was an imitation shotgun. The police brought the imitation shotgun downstairs and left the residence. Eventually, the owner of the unit returned and consented to a search of the premises, which yielded the sneakers and the imitation shotgun the officers previously found inside the residence.

4

On February 7, 2019, defendant was charged with two counts of fourth-degree conspiracy, contrary to N.J.S.A. 2C:5-2; unlawful possession of a weapon, contrary to N.J.S.A. 2C:39-5(d) (count one); third-degree conspiracy with a juvenile to unlawfully possess a weapon, contrary to N.J.S.A. 2C:24-9(a) and 2C:2-6(a) (count two); fourth-degree unlawful possession of a weapon, contrary to N.J.S.A. 2C:39-5(d) and 2C:2-6(a) (count three); third-degree conspiracy to possess a weapon for an unlawful purpose, contrary to N.J.S.A. 2C:5-2 and 2C:39-4(d) (count four); second-degree conspiracy with a juvenile to commit possession of a weapon for an unlawful purpose, contrary to N.J.S.A. 2C:24-9(a) and 2C:2-6(a) (count five); two counts of third-degree possession of a weapon for an unlawful purpose, contrary to N.J.S.A. 2C:39-4(d) and 2C:2-6(a) (counts six and seven); unlawful possession of an imitation firearm, contrary to N.J.S.A. 2C:39-4(e) (count eight); third-degree conspiracy with a juvenile to possess an imitation firearm for an unlawful purpose, contrary to N.J.S.A. 2C:39-4(e), 2C:24-9(a), and 2C:2-6(a) (count nine); fourth-degree possession of an imitation firearm for an unlawful purpose, contrary to N.J.S.A. 2C:39-4(e) and 2C:2-6(a) (count ten); second-degree conspiracy to commit robbery, contrary to N.J.S.A. 2C:15-1(a) and 2C:5-2 (count eleven); first-degree conspiracy with a juvenile to commit armed robbery, contrary to N.J.S.A.

A-0686-19

2C:15-1(a), 2C:24-9(a), and 2C:2-6 (count twelve); two counts of first-degree armed robbery, contrary to N.J.S.A. 2C:15-1(a), 2C:15-1(b), and 2C:3-6(a) (counts thirteen and fourteen); fourth-degree tampering with evidence, contrary to N.J.S.A. 2C:28-6(1) and 2-6(a) (count fifteen); third-degree hindering apprehension, contrary to N.J.S.A. 2C:29-3(b)(1) and 2C:2-6(a) (count sixteen); third-degree hindering the apprehension of another, contrary to N.J.S.A. 2C:29-3(a)(3) and 2C:2-6(a) (count seventeen); and two counts of fourth-degree obstructing the administration of law, contrary to N.J.S.A. 2C:29-1(a), 2C:29-1(b), and 2C:2-6(a) (counts eighteen and nineteen).

On August 23, 2018, in a separate indictment, defendant was charged with third-degree conspiracy to commit theft and forgery, contrary to N.J.S.A. 2C:20-3 and 2C:21-1(a)(3) (count one); third-degree theft by unlawful taking, contrary to N.J.S.A. 2C:20-3(a) and 2C:2-6 (count two); second-degree promotion of organized street crime, contrary to N.J.S.A. 2C:20-3(a) and 2C:33-30(a) (count three); and third-degree forgery, contrary to N.J.S.A. 2C:21-1(a)(2), 2C:21-1(a)(3), and 2C:2-6 (count four).

At the conclusion of the suppression hearing testimony, the judge denied defendant's suppression motion, finding the testimony of Detective Mauro credible and that "[t]he conduct of the officers was consistent with their desire

6

to conduct a security sweep of the area and nothing more." The judge determined the officers "evacuat[ed] the surroundings for the safety of others around in an effort to engage in the act of community caretaking, rather than taking stationary surveillance, and continuing communications with those inside." Addressing the reasonableness of the officers' actions, the judge elaborated:

> And after all had exited, a second call was made for anyone else in the interior of the residence to exit the premises. Officers then were made aware . . . by way of response to their call, of an individual who responded from the upstairs part of the residence. That person was ultimately subsequently retrieved and also taken out.
>
> At that point the officers then conducted a security sweep of the residence to clear the area, doing so by engaging in a room[-]by[-]room visual inspection . . . of the premises for anyone on the premises or hiding. At some point while they were in . . . a second bedroom that's being swept, they notice a crawl space which to them, by . . . Officer Mauro's own testimony, seemed to be a place where somebody tried to get into because underneath the crawl space was a . . . piece of Tupperware that had a top dented on top of it, the same way it would if somebody was trying to stand on it.
>
> In any event it was a crawl space that warranted at least a visual inspection to ensure that nobody was hiding there, given that it was an area where the officers believe that somebody could hide. And that was the primary focus of doing the . . . visible search by the officers. They were only looking in areas where

somebody could be hiding in, again in furtherance of their security sweep and . . . nothing else.

This given that though individuals had exited the home, individuals who had been alleged to have been involved in an armed robbery, no one exited that home with a weapon. Allowing officers then to reasonably conclude that perhaps there would still be a weapon on the premises or that there was a need to ensure that there was no weapon on the premises, given that a weapon had not been found yet. The residence was apparently occupied and vacated by . . . at least some individuals who fit the description of the assailants.

The judge entered a memorializing order. Thereafter, on March 8, 2019, defendant pled guilty to first-degree conspiracy with a juvenile to commit armed robbery, third-degree conspiracy to commit theft, and second-degree promoting organized street crime. On August 30, 2019, he was sentenced to a ten-year term of imprisonment in accordance with the plea agreement.[1] This appeal ensued.

Defendant presents the following points for our consideration:

---

[1] According to the New Jersey Department of Corrections (DOC) website, defendant was paroled from Garden State Youth Correctional Facility on February 22, 2021. See Offender Search Form, N.J. DEP'T OF CORR., https://www20.state.nj.us/DOC_Inmate/inmatefinder?i+I (last visited Feb. 8, 2022).

POINT I

THE "PROTECTIVE SWEEP" OF THE APARTMENT WAS UNCONSTITUTIONAL PURSUANT TO THIS COURT'S RECENT HOLDING IN <u>STATE V. RADEL</u>.[2] THEREFORE, THE SNEAKERS AND FAKE GUN SEIZED MUST BE SUPPRESSED AS THE FRUIT OF THAT UNLAWFUL SEARCH.

POINT II

THE LAW REQUIRING SENTENCING MITIGATION FOR YOUTHFUL DEFENDANTS DEMANDS RETROACTIVE APPLICATION BECAUSE THE LEGISLATURE INTENDED IT, THE NEW LAW IS AMELIORATIVE IN NATURE, AND FUNDAMENTAL FAIRNESS REQUIRES RETROACTIVITY (Not Raised Below).

A.   The Legislature Intended Retroactive Application.

    i.   The Legislature Did Not Express A Clear Intent For Prospective Application.

    ii.   The Other Language Of The Mitigating Factor Indicates Retroactive Application; The

---

[2] 465 N.J. Super. 65, 71 (App. Div. 2020), <u>certif. granted</u>, 245 N.J. 466 (2021). The Supreme Court heard oral argument in the <u>State v. Radel</u> matter, which was consolidated with <u>State v. Terres</u>, No. A-0996-18 (App. Div. July 23, 2020), <u>certif. granted</u>, 245 N.J. 471 (2021), on September 27, 2021. The Court issued its written decision for both matters on January 20, 2022. <u>See</u> <u>State v. Radel</u>, ___ N.J. ___, ___ (2022). We permitted counsel to file supplemental letter briefs in accordance with <u>Rule</u> 2:6-11(d) after the Court rendered its decision.

Presumption Of Prospective Application Is Inapplicable; And The Law Is Clearly Ameliorative.

    iii.    There Is No Manifest Injustice To The State In Applying The Mitigating Factor Retroactively.

    B.    Retroactive Application Of The Mitigating Factor Is Required As A Matter Of Fundamental Fairness, And To Effectuate The Remedial Purpose Of The Sentencing Commission's Efforts Regarding Juvenile Sentencing.

## II.

In first addressing Point I of defendant's brief, we note "[a]ppellate review of a motion judge's factual findings in a suppression hearing is highly deferential." State v. Gonzales, 227 N.J. 77, 101 (2016) (citing State v. Hubbard, 222 N.J. 249, 262 (2015)). Appellate courts reviewing a trial court's ruling on a motion to suppress must evaluate whether "the trial court's determination is 'so clearly mistaken that the interests of justice demand intervention and correction.'" State v. Lamb, 218 N.J. 300, 313 (2014) (quoting State v. Elders, 192 N.J. 224, 244 (2007)). A trial court's factual determinations are entitled to deference "because those findings 'are substantially influenced by [an] opportunity to hear and see witnesses and to have the feel of the case, which

a reviewing court cannot enjoy.'" State v. Gamble, 218 N.J. 412, 424-25 (2014) (alteration in original) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)).

Moreover, we should not overturn a trial court's determinations merely because we disagree with the inferences the trial court drew or the evidence it accepted or because we would have reached a different conclusion. Elders, 192 N.J. at 244. Accordingly, "[a]n appellate court reviewing a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." State v. Rockford, 213 N.J. 424, 440 (2013) (quoting State v. Robinson, 200 N.J. 1, 15 (2009)). We owe no deference, however, to the trial court's legal conclusions or interpretation of the legal consequences that flow from established facts. Hubbard, 222 N.J. at 263. Thus, our review in that regard is de novo. State v. Watts, 223 N.J. 503, 516 (2015) (quoting State v. Vargas, 213 N.J. 301, 327 (2013)).

"[A] 'protective sweep' is a quick and limited search of premises, incident to an arrest[,] and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." State v Davila, 203 N.J. 97, 113 (2010) (quoting Maryland v. Buie, 494 U.S. 325, 327 (1990)).

[A] protective sweep incident to an in-home arrest is permissible under the following circumstances. First, the police may sweep the "spaces immediately adjoining the place of arrest from which an attack" might be launched even in the absence of probable cause or reasonable suspicion. [Buie, 494 U.S. at 334]. Any wider sweep must be justified by "specific facts that would cause a reasonable officer to believe there is an individual within the premises who poses a danger" to the arresting officers. [Davila, 203 N.J. at 115]. Second, the sweep must be "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." [Buie, 494 U.S. at 327]. Although the sweep "is not a search for weapons or contraband," such items may be seized if observed "in plain view" during the sweep. [Davila, 203 N.J. at 115]. Last, the sweep should last "no longer than is necessary to dispel the reasonable suspicion of danger" or "to complete the arrest and depart the premises." Ibid. (quoting [Buie, 494 U.S. at 335-36]).

[State v. Cope, 224 N.J. 530, 548 (2016).]

On March 26, 2021, our Court granted certiorari in Radel and Terres. Both matters addressed the issue of "whether the police have a right to conduct a protective sweep of a home when an arrest is made outside the home and, if so, the requisite justification for a warrantless entry and protective sweep." Radel, ___ N.J. at ___ (slip op. at 27). In Radel, the Passaic County Prosecutor's Office received a court order authorizing Little Falls police officers to retrieve any firearms in Christopher Radel's home immediately upon receipt of the order. Id. at ___ (slip op. at 39). In between the order's issuance and execution,

12

Sergeant Robert Prall learned Radel possessed multiple firearms, "had two active municipal arrest warrants," and lived at a different location than was stated in the order. Ibid. Radel's prior criminal conviction made possessing a firearm unlawful. Ibid. Rather than obtain a search warrant to search Radel's home based on probable cause, Sergeant Prall conducted a sting operation with seven officers to enforce the order and arrest Radel. Id. at ___ (slip op. at 39-40). Police surveilled the home for about ten minutes, then arrested Radel "in his driveway while placing a laundry basket in his car." Id. at ___ (slip op. at 40).

Without attempting to ask for consent to search the home, Sergeant Prall ordered the officers to conduct a protective sweep of the home and detached garage for the officers' "safety because there were weapons and other persons 'potentially on the property.'" Id. at ___ (slip op. at 9). Sergeant Prall reached this conclusion based on the two vehicles parked in the driveway, suggesting someone else's presence on the property; the home's windows were covered; "the blue-jacketed person" Sergeant Prall observed in the backyard may not have been the same person wearing a blue jacket (Radel) who exited the front door; and the order directed the officers to retrieve the firearms. Ibid.

13

A-0686-19

The police later obtained a search warrant and seized the weapons, ammunition, and narcotics found earlier. Id. at ___ (slip op. at 10). In our published opinion, we held the police were not entitled to conduct a protective sweep of Radel's home because "[he] was outside his home, under arrest, and in handcuffs before police made the decision to enter his home." Radel, 465 N.J. Super. at 71.

In Terres, two officers from the Gloucester County Prosecutor's Office and two State Troopers visited the trailer park where Keith Terres resided to execute an arrest warrant for Tyler Fuller. Radel, ___ N.J. at ___ (slip op. at 17-18). Terres, who State Troopers arrested and had in custody for narcotics possession, informed the officers that Fuller may be found "in the first building to the right in the trailer park." Id. at ___ (slip op. at 18). The officers "observed two men inside, later identified as Mark Boston and William Willis," upon approaching the building. Id. at ___ (slip op. at 19).

Boston attempted to flee towards a bedroom, but an officer pursued him believing he was Fuller. Ibid. The bedroom where the officer detained Boston was covered in shell casings and bullets. Ibid. Willis informed the officers that Fuller was in a back trailer because he saw him there minutes earlier with another male. Ibid. The officers knew Terres owned the back trailer. Ibid.

A-0686-19

"Willis warned the officers to 'be careful. . . . There's two males back there.'" Ibid. (alteration in original).

Two officers detained Boston and Willis while the other two, Detective John Petrosky and Trooper Richard Hershey, proceeded to Terres's trailer to arrest Fuller. Id. at ___ (slip op. at 19-20). Through the window, Detective Petrosky "observed Fuller talking to a woman later identified as Allison Terres." Id. at ___ (slip op. at 20). When Detective Petrosky yelled for Fuller to get on the ground, he fled through the front door, and Trooper Hershey intercepted him. Ibid. Trooper Hershey handcuffed Fuller "within five feet of the front door" and struggled to remove a hypodermic needle from Fuller's pocket. Ibid. Detective Petrosky stepped over Trooper Hershey "and asked Ms. Terres, 'where's the other male?'" Ibid. She claimed, "no one else was inside." Detective Petrosky shouted for anyone inside to come out and conducted a protective sweep upon receiving no response. Ibid. He saw a crossbow and arrows inside. Ibid.

In order to find the man Willis mentioned, "Detective Petrosky observed behind a washer and dryer a three- to four-foot wide and three-foot deep hole in the floor partially covered by plywood. The hole appeared large enough for a person to hide under the residence." Id. at ___ (slip op. at 21). Upon inspecting the hole, Detective Petrosky saw, but did not touch, a firearm and gun barrels.

15

Ibid. The police returned the next day with a search warrant and seized multiple weapons from Terres's trailer. Ibid.

In our unpublished opinion in Terres, we affirmed the trial court's order denying the defendant's motion to suppress. Id. at ___ (slip op. at 22). We concluded Detective Petrosky conducted a lawful sweep "based on [the] principles articulated in Cope, 224 N.J. at 546-47 and Davila, 203 N.J. at 13[,] cases in which the police were already lawfully inside the home before the onset of the sweep." Id. at ___ (slip op. at 23).

In its recent opinion, our Court has pronounced in order to conduct a protective sweep when an arrest occurs outside the home, police officers must "have a reasonable and articulable suspicion 'that the area to be swept harbors an individual posing a danger to those on the arrest scene.'" Id. at ___ (slip op. at 34) (quoting Buie, 494 U.S. at 334). Our Court held:

> Whether police officers making an arrest just outside a home have a reasonable and articulable suspicion of a safety threat necessitating a protective sweep of parts or all of the residence will depend on the facts known to the officers at the time. See [United States v. Colbert, 76 F.3d 773, 776-77 (6th Cir. 1996)]. An "unparticularized suspicion" or a "hunch" that an attack may be launched from a residence will not be sufficient to justify breaching the threshold of a home and undertaking a protective search. See Buie, 494 U.S. at 332 (quoting [Terry v. Ohio, 392 U.S. 1, 27 (1968)]). Courts must "look at the totality of the circumstances

16

to determine if there is an 'individualized, rather than generalized, suspicion,'" [State v. Bryant, 227 N.J. 60, 70 (2016) (quoting Davila, 203 N.J. at 129)]), understanding that "[t]here is no mathematical formula to determine what amount of suspicion is reasonable," ibid. [(alteration in original)] (citing State v. Pineiro, 181 N.J. 13, 27 (2004)).

[Id. at ___ (slip op. 34-35).]

Furthermore, the Court articulated several factors courts should consider "in determining whether a protective sweep is justified when an arrest is made outside the home." Id. at ___ (slip op. at 38). These factors include:

(1) whether the police have information that others are in the home with access to weapons and a potential reason to use them or otherwise pose a dangerous threat; (2) the imminence of any potential threat; (3) the proximity of the arrest to the home; (4) whether the suspect was secured or resisted arrest and prolonged the police presence at the scene; and (5) any other relevant circumstances. Entry into the home and a protective sweep cannot be based on a self-created exigency by the police. See Davila, 203 N.J. at 103.

[Ibid.]

Applying the factors above, the Court affirmed our decisions "in both Radel (invalidating the protective sweep) and Terres (upholding the protective sweep)." Id. at ___ (slip op. at 46). The Court highlighted "no danger arose that mandated an entry of [Radel's] home without a search warrant" because "[t]he officers had no specific information that another person was in the house, nor

17

was there information from which they could reasonably infer that someone inside posed an imminent danger." Id. at ___ (slip op. at 45). The arrest occurred "a distance from the home's entrance" in Radel's driveway "with watchful eyes on the front and rear doors of the house." Ibid. "On the other hand, in Terres, Detective Petrosky and Trooper Hershey faced unexpected and fast-evolving circumstances that signaled danger and the need for prompt action to safeguard their lives." Ibid. Willis warned the officers that another male was with Fuller and to be cautious, "a clear signal of a potential threat;" Fuller was arrested and handcuffed within five feet of the door; and Trooper Hershey struggled with Fuller as Detective Petrosky swept the trailer, leaving him vulnerable to an unexpected attack. Id. at ___ (slip op. at 45-46).

The totality of the circumstances in the matter under review indicate the officers had "a reasonable and articulable suspicion of a safety threat necessitating a protective sweep of . . . the residence." Id. at ___ (slip op. at 34). Detective Bauer and Officer Mauro learned from the victims that at least three individuals were involved in the robbery, and one possessed a gun, which was used to threaten the victims. The victims and witnesses also informed the officers that five or six individuals ran towards condominium unit 347. Unlike Radel, the police here had information that other individuals were inside the

18

condominium unit armed with weapons, which the police had surveilled for about an hour.

Moreover, the police waited outside the unit, knocked on the door, announced themselves, but received no answer while hearing a commotion inside. Finally, someone answered, and seven or eight men and women inside matching the description the police were given were ordered outside. The individuals were then secured near the front door as in Terres, and not a distance away, as in Radel.

Furthermore, the police officers heard noise coming from the individuals inside condominium unit 347, who initially refused to respond to the officers' attempts to make contact. Eventually, after more than one hour of trying to communicate with the individuals inside, five individuals exited the premises, and the officers then learned that another person had remained. After that individual was removed, the officers performed a protective sweep to ensure no one was hiding who could have possessed or accessed a weapon.

The crawl space was large enough for a person to hide inside, similar to the hole under the floor in Terres. The officers found the imitation shotgun in the crawl space and tried to clear it to render it safe but did not remove it from the premises. In the matter under review, we conclude the officers had "a

19

reasonable and articulable suspicion of a safety threat" warranting a protective sweep. Id. at ___ (slip op. at 4). Therefore, we affirm the denial of defendant's motion to suppress.

## III.

In Point II of his brief, defendant contends N.J.S.A. 2C:44-1, which added "youth" as a new mitigating factor, should be applied to him retroactively, and the matter should be remanded for re-sentencing. The amendment became effective October 19, 2020. L. 2020, c. 110 (eff. Oct. 19, 2020). For the first time on appeal, defendant argues the sentencing judge did not consider the fact that he was under the age of twenty-six at the time the offenses occurred. Defendant further contends the revised statute should apply retroactively to him because:

> (1) the Legislature did not express a clear intent for prospective application;
>
> (2) it is an ameliorative statute intended to lessen the harshness of sentencing laws for juvenile; and
>
> (3) the State would not suffer manifest injustice if the mitigating factor is retroactively applied.

Defendant was paroled on February 22, 2021; therefore, the issue is moot. We consider an issue moot when our decision sought in a matter, "can have no practical effect on the existing controversy." Redd v. Bowman, 223 N.J. 87, 104

20

(2015) (quoting <u>Deutsche Bank Nat'l Tr. Co. v. Mitchell</u>, 422 N.J. Super. 214, 221-22 (App. Div. 2011)).  "[C]ourts of this [S]tate do not resolve issues that have become moot due to the passage of time or intervening events" and will not resolve such cases solely to "test the validity of [an] underlying claim of right in anticipation of future situations."  <u>Wisniewski v. Murphy</u>, 454 N.J. Super. 508, 518 (App. Div. 2018) (first alteration in original) (quoting <u>Davila</u>, 443 N.J. Super. at 584).  Therefore, there is no need for us to address defendant's arguments raised in Point II.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

21

A-0686-19